[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 358 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 359 
The first question presented by this case is, whether the city of Buffalo had power in December, 1853, to purchase land for the purpose of a market. It is now well settled that corporations, being merely artificial persons, derive all their powers from the law which creates them, or from some other positive statute. A natural person may do any act except such as the law forbids. An artificial person can do no act except such as the law authorizes. A corporation, however, is not limited to the exercise of the powers specifically granted, but possesses in addition all such powers as are either necessarily incident to those specified, or essential to the purposes and objects of its corporate existence. *Page 360 
A municipal corporation, therefore, may at common law, unless restrained by some statute, purchase and hold all such real estate as may be necessary to the proper exercise of any power specifically conferred, or essential to those purposes of municipal government for which it was created. This principal of the common law is confirmed by our statute (1 R.S., 599, § 1), which declares that every corporation may "hold, purchase and convey such real and personal estate as the purposes of the corporation shall require."
The charter of the city of Buffalo does not, in express terms, authorize the common council to purchase real estate for a market. But it is contended: 1. That it is shown, by the common understanding and universal practice in this country, that the establishment of public markets, and the procuring of the necessary real estate for that purpose, is one of the duties which devolve upon the government of every municipal corporation; and 2. That the authority "to establish" such markets being expressly conferred upon the city of Buffalo by its charter, the power to purchase a site results as a necessary incident.
In the view I have taken of this case it does not become necessary to examine the first of these propositions. By § 6, title 3, of the city charter of Buffalo, in force when this purchase was made (Laws of 1843, 125), the common council were authorized to make ordinances, rules and regulations for a great variety of purposes, and among others "to establish and regulate markets;" and the question is whether this power can be properly and effectually carried out according to the spirit and intent of the provision without the power to purchase the necessary ground for a market. Were the words "to regulate" the only words here used, it is clear that the authority to purchase the ground could not be deduced from them. Those words naturally, if not necessarily, presuppose the existence of the thing to be regulated. Not so, however, with the words *Page 361 
"to establish." Although these words may mean simply to confirm, yet their more common import is, permanently to create or found. In the connection in which they stand here, at least, this would seem to be their natural meaning, because otherwise they would add nothing to the power conferred by the words "to regulate." It is one of the familiar rules for interpreting statutes, that they are to be so construed, if possible, as to give force and significance to every word. This rule can be observed, in this instance, only by referring the words "to establish" to the act of originating, and the other words to that of subsequently regulating the markets. The words "to regulate," alone, would obviously comprise all that could be required to be done after the market was once created.
Assuming, then, as I think we may, that the words "to establish" mean to found originally, it may still be said that it does not follow that the power to purchase land is conferred, because markets may be and frequently are established in cities and villages upon the lands of private individuals. This view, however, would leave it at the option of individuals whether any market should exist or not. If no one was willing to have a market upon his premises, the power of the common council to establish markets would be annulled. But it is, I apprehend, a sound rule, that when power is given to a corporation to do an act, it has a right to do whatever is necessary to accomplish the act. This rule has its limitations, but it is unnecessary to recur to them here. A market is a public place for the sale of commodities. Without the power to procure a suitable place, the first step could not be taken towards the establishment or foundation of a market. The power to establish, therefore, must of necessity include that of procuring the requisite site. It is not claimed on the part of the plaintiffs that the change from the statute of 1832 to that of 1843, in respect to the manner in which the power to establish markets is conferred, is of any *Page 362 
importance. In the former act the power is given in direct terms, while in the latter it is given only as part of the power to make by-laws, ordinances, c. It does not appear to me that this change can materially affect the power. There must necessarily be some resolution, ordinance or regulation by which the common council expresses its determination to establish the market, forming the basis to which all the subsequent measures are referred.
It is urged, in opposition to the views which have been presented, that notwithstanding the charter of 1832 authorized the common council to establish markets, yet the power to purchase market grounds was expressly conferred by the act of 1835 (Laws of 1835, 95, § 4), and this is relied upon as a legislative construction of the previous act. But it will be seen that the main object of § 4 of the act of 1835 was to authorize the common council to borrow money upon the credit of the city, and that what is said as to purchasing market grounds is merely expressive of the purpose to which the money was to be appropriated. It was undoubtedly supposed, whether rightfully or not, that the power to borrow money could not be exercised without legislative authority. Similar acts have been passed in regard to other cities, whose charters contained the same authority to establish markets as that of Buffalo. By an act passed May 11, 1835, the city of Rochester was authorized to purchase "a site for a new market," but this provision was coupled with others conferring powers which required the interposition of the legislature; as, to levy money by tax to erect the market, the power to raise money by taxation being limited by the charter. So, also, a similar power "to purchase a market lot or lots," conferred upon the common council of the city of Rochester, by an act passed April 16th, 1836, was directly connected with a provision authorizing them "to loan, on the credit of the corporation, a sum not exceeding fifteen thousand dollars," c. No inference can be safely drawn from these *Page 363 
and similar enactments in opposition to the construction here put upon the words "to establish." My conclusion, therefore, is, that the city of Buffalo had power to make the purchase in question.
But admitting that the city had a right to make the purchase, it is denied that it could purchase upon credit, and execute the bond given for the purchase money. The power of corporations in general to make contracts and incur debts in the prosecution of their legitimate business, and to give their promissory notes for such indebtedness, would seem to be firmly established, not only by universal practice, but by repeated judicial decision. (Mott
v. Hicks, 1 Cow., 513; Moss v. Oakley, 2 Hill, 265;Kelly v. The Mayor of Brooklyn, 4 Hill, 263; Moss v.McCullough, 5 Hill, 131; Attorney-General v. Life and FireInsurance Company, 9 Paige, 470; McCullough v. Moss, 5Denio, 567.)
In the last of these cases the judgment was reversed, not on the ground that the corporation had not the power to contract the debt, or to give the promissory note, but for the reason that the property purchased was not required for the legitimate purposes of the company. Senator Lott, by whom the leading opinion was given, says: " I am satisfied that the note in question was given for purposes and objects unauthorized by its charter, and, therefore, not obligatory." It is true, the learned senator, in the course of his opinion, seems to intimate a doubt whether a corporation like that of the Rossie Lead Mining Company, instituted for specific business purposes, with a limited capital, can virtually add to that capital by the purchase of a large amount of property upon credit, especially where, as in that case, each stockholder is made individually liable for all the debts of the company.
However this may be, sound reason, no less than the authorities to which I have referred, forbid that it should be held that a corporation may not incur a debt in the exercise of its appropriate powers, or may not purchase, upon a *Page 364 
credit, property which is required for purposes authorized by its charter. Municipal corporations, especially, obtain their funds, for the most part, periodically, by means of annual taxation, and it is impossible by any degree of care to adjust their means to their wants so accurately but that exigencies will arise, rendering necessary a resort to the credit of the corporation.
To deny to such corporations the power to use their credit in any case, would scarcely comport with the objects for which they are created. Under such a rule they could not procure materials for the repair of a bridge, unless the money had been raised in advance. The affairs of no municipal corporation were ever conducted, I presume, without incurring obligations, for various purposes, in anticipation of its revenues. It may be said that there is a distinction between incurring debts for the ordinary and current expenses of the corporation, to be defrayed by the expected annual income, and debts upon an extended credit, for objects of a permanent character, as, for instance, that a debt may be created for the repair of a bridge or market, but not for the erection of or procuring a suitable site for such market. I am unable to discover any solid basis for such a distinction, or any definite line by which it could be marked.
It is easy to see that it would be extremely difficult, if not impossible, to manage the affairs of a municipal corporation, without the power to contract upon its credit. Every contract for labor, not paid for in advance, is necessarily a contract upon credit, because the labor, when once performed, cannot be recalled. It is otherwise in case of the purchase of property to be paid for on delivery, because, unless payment is made, it need not be delivered. Still, if it consist of several parcels, as of several loads of lumber or of stone, to be delivered at different times, and paid for when all are delivered; this is a contract upon credit for all except the last load. Were a corporation authorized *Page 365 
in general terms to build a bridge, without specification of manner or means, it would scarcely be doubted that it might contract with some person to furnish the materials and erect the bridge at a specific price, to be paid upon the completion of the job, and yet this would be to build the bridge entirely upon the credit of the corporation.
But it is useless to multiply arguments upon this point. The power of a corporation to contract upon its credit cannot reasonably be denied; and if it may do so at all, there is, I think, no rule of law which limits the length of such credit. If a corporation may make an executory contract for property or services, it must of necessity have power to agree upon the mode and terms of payment; and to say that it cannot also agree as to the time of payment, is to make a distinction which rests upon no sound principle, and is not warranted by any authority.
If, then, the city of Buffalo had power, under its charter, to purchase ground for a market, it had authority, so far as the charter is concerned, to do so upon a credit to which there was no limit but its own discretion, and the right to give the single bill in question would follow as a necessary consequence. Power to contract the debt must carry with it power to give a suitable acknowledgment of the indebtedness, in the form either of a promissory note or a single bill. I can conceive no well grounded rule which would concede one of these powers and deny the other, and no such distinction is warranted by the cases.
It may be objected that the reasoning here adopted tends to establish the right of a corporation to contract a debt for any authorized purpose, by borrowing the money necessary to accomplish it; a right which, from the numerous legislative acts on the subject, it would seem corporations have not generally been supposed to possess. It is true the power to contract to pay A. $10,000 at the end of a year for doing certain work, and the power to borrow $10,000 of B., upon a credit of a year, for the purpose of paying *Page 366 
A. for doing the work, might seem, at first view, to be substantially identical. The amount is the same, and the time of payment the same; the creditor only is different.
A little examination, however, will show that there is a very material difference between the two. If the power of the corporation to use its credit is limited to contracting directly for the accomplishment of the object authorized by law, then the avails or consideration of the debt created cannot be diverted to any illegitimate purpose. The contract not only creates the fund, but secures its just appropriation. On the contrary, if the money may be borrowed, the corporation will be liable to repay it, although not a cent may ever be applied to the object for which it was avowedly obtained. It may be borrowed to build a market and appropriated to build a theatre, and yet the corporation would be responsible for the debt. The lender is in no way accountable for the use made of the money. It is plain, therefore, that if the policy of limiting the powers and expenditures of corporations to the objects contemplated by their charters is to be carried out, their right to incur debts for those objects must be strictly confined to contracts which tend to their direct accomplishment. If they may procure the requisite funds by the indirect method of borrowing, they may resort to any other indirect mode of obtaining them, such as establishing some profitable branch of trade, entering into commercial enterprises,c., the avowed object being to obtain the means necessary to accomplish some authorized purpose. No one can fail to see that to concede to corporations the power to borrow money for any purpose, would be entirely subversive of the principle which would limit their operations to legitimate objects. Hence the distinction between such a power, and that of stipulating for a credit in a contract made for the direct advancement of some authorized corporate object. It is true that the act to restrict and regulate the power of municipal corporations to borrow money, contract debts, *Page 367 
and loan their credit, passed in 1853 (Laws of 1853, 1135), would seem to proceed upon the assumption that such corporations, independently of legislative restrictions, have the power to borrow money. This important question, however, is yet to be judicially settled, but as it is not involved in this case, I will not dwell longer upon it.
The only remaining question which it is necessary to notice is, whether the power to contract this debt is affected by the provisions of the act last referred to. No facts are shown to bring the case within the purview of § 3; but what is claimed is, that it is within the prohibition of § 5, which forbids the contracting, by a municipal corporation, of any "funded debt," except in the mode there pointed out by the statute. Is this, then, a "funded debt?" If we rely for a definition of these terms, either upon lexicographers or financial writers, it is clear that this is not a funded debt. The term "fund" was originally applied to a portion of the national revenue set apart or pledged to the payment of a particular debt. A "funded debt," therefore, was a debt for the payment of the principle or interest of which some fund was appropriated. Bouvier says: "Funded debt is that part of the national debt for which certain funds are appropriated towards the payment of the interest;" and this definition corresponds substantially with that given by all writers on the subject.
The term "funding," however, has been sometimes applied in this country to the process of collecting together a variety of outstanding debts against corporations, the principal of which was payable at short periods, and borrowing money upon the bonds or stocks of the corporation to pay them off; the principal of such bonds or stocks being made payable at periods comparatively remote. But I am not aware that, even in common parlance, the term has ever been made use of to describe an ordinary debt, growing out of a transaction with one individual and represented by a single instrument, as in this case. I think *Page 368 
it is essential to the idea of a funded debt, even under the broadest use of that term, that the debt should be divided into parts or shares, represented by different instruments, so that such parts or shares may be readily transferable. The act of 1835 contemplates three classes of debts. Of these, funded debts constitute one class, temporary loans another, and all other debts a third. Now, the provisions of § 3 show that something more was intended to be included in the third class than debts for the ordinary annual expenses, otherwise it never would have permitted that class of debts to run up to five per cent of the whole "aggregate valuation of the real estate of the city," nor to one-quarter of that amount. It must, therefore, have been intended to include all debts which were not in some legitimate sense "funded debts," and I can conceive of no just and appropriate use of that term which would include the debt in question.
These views render it unnecessary to consider the question whether one or more of the tax payers of a city can maintain a suit brought to restrain the municipal authorities in the exercise of their corporate powers.
The judgment of the supreme court should be affirmed, with costs.