PEOPLE ex rel. PEENE et al. v. CARPENTER.

(Supreme Court, Appellate Division, Second Department. June 28, 1898.)

MUNICIPAL CORPORATIONS—FUNDED DEBTS.

Under section 5 of the general municipal law (Laws 1892, c. 685), relating to funded debts, the term "funded debts" includes all municipal indebtedness embraced within, or evidenced by, bonds, the principal of which is payable at a time beyond the current fiscal year of their issue, with periodical terms for the payment of interest, and where provision is made for payment by the raising of the necessary funds by future taxation, and the quasi pledging in advance of the municipal revenue.

Submission of controversy between the people, on the relation of John G. Peene and others, commissioners to locate a street, and Francis M. Carpenter, county treasurer of the county of Westchester. Judgment for defendant.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Theo. N. Silkman, for plaintiffs.
Henry R. Barrett, for defendant.

GOODRICH, P. J.    The plaintiffs were appointed commissioners,. under chapter 493 of the Laws of 1892, to continue a street known as "Warburton Avenue," in the city of Yonkers, through a portion of the town of Greenburg, and to construct the same, together with the necessary bridges thereon.    The act provided that the expenses of the road should be paid by the town, and the expenses of the bridges. by the county.    There was no provision in this act for the issue of county bonds, but by an amendment (chapter 419 of the Laws of 1893) it was provided (section 2) as follows:

"The cost of the construction of any bridges provided in said act may be paid by levy upon the taxable property of said county in the taxes levied for any one year, or by the issuing of bonds for the cost and expense thereof as. the board of supervisors of any county may determine.    Such bonds shall be of such denomination, bear such interest and be payable at such time or times as the board of supervisors may determine."

The commissioners, in pursuance of their authority, in June, 1893, presented to the board of supervisors of the county of Westchester a. verified statement of the cost of the construction of such bridges, amounting to $64,978, together with the incidental expenses of the commission, amounting to $8,557.90, making the total cost of construction and expenses $73,535.90.    No action was taken by the supervisors until April 15, 1898, when the board, consisting of 32 members, passed a resolution, by a vote of 21 in the affirmative and 9 in the negative (2 supervisors being absent), to borrow the sum of $64,978, upon the credit of the county, to pay for the cost of the construction of the bridges, and authorized the county treasurer to borrow such sum and issue bonds therefor; such bonds to bear interest at the rate of 4 per cent. per annum, payable at the office of the county treasurer; $10,000 of the bonds to become due on the 1st day of June, 1900, and an equal amount on the same day in the four succeeding years; the balance, $14,978, on the 1st day of June, 1905; the chairman of the board being authorized to execute the bonds, and the clerk of the board to affix the seal of the board; the bonds to be delivered to the county treasurer, who also was to sign and issue them; the interest on the bonds to be paid semiannually.    The county treasurer was also directed in each of the stated years to submit annually to the board a statement of the amount of the money necessary to be raised for the payment of the interest and principal; such amount to be annually levied and collected in the same manner as other county charges, and to be paid to the county treasurer, who was directed to apply the same to the payment of the principal and interest of the bonds as they matured.    The resolution also provided that the county treasurer should give adequate security "for the faithful performance of his duty in issuing said bonds, and the lawful application of the funds arising therefrom, and of the funds which may be raised by tax for the payment thereof, which may come into his hands"; the bonds to be sold by him, and the proceeds applied to the payment of the costs of the construction above referred to.    The county treasurer refused to execute the bond for security, and to sign the bonds authorized by said resolution, "upon the ground that the resolution of the said board of supervisors creates a funded debt, and.

for that reason required an affirmative vote of twenty-two supervisors, being two-thirds of all the supervisors elected." The relators ask judgment that a peremptory writ of mandamus issue, requiring Mr. Carpenter, the county treasurer, "to execute and deliver the bond required by him to be given under the said resolution of the said board of supervisors, and requiring that he shall sign the bonds authorized to be issued by the said board of supervisors," while the defendant demands judgment that the resolution of the board "be adjudged invalid, for the reason that the same received only a majority vote of all the members of the board of supervisors elected."

The real question involved in the submission is whether the bonds fall within the category of a "funded debt." If they do, they can be issued only by a two-thirds vote of the board of supervisors.

Section 5 of the general municipal law (1 Rev. St. [9th Ed.] p. 582) reads as follows:

"'Funded Debt. A funded debt shall not be contracted by a municipal corporation, except for a specific object, expressly stated in the ordinance or resolution proposing it; nor unless such ordinance or resolution shall be passed by a two-third vote of all the members elected to the board or council adopting it, or submitted to, and approved by the electors of the town or county, or tax payers of the village or city when required by law. Such ordinance or resolution shall provide for raising annually, by tax, a sum sufficient to pay the interest and the principal, as the same shall become due."

By section 1 of this law, the term "municipal corporation" includes a county.

Turning now to the county law (1 Rev. St. [9th Ed.] p. 597), the board of supervisors has power, among others (section 12, subd. 6), to borrow money. Sections 5 and 6 of the municipal law are taken substantially from chapter 603 of the Laws of 1853; the difference being that these sections of the municipal law require the annual raising by tax of the sum sufficient to pay principal and interest, while the Laws of 1853 provide for the annual levy of a sum sufficient to pay the interest, and an additional sum for the purpose of constituting a sinking fund for the redemption of the principal of the bonds.

The case of Ketchum v. City of Buffalo, 14 N. Y. 356, related to bonds issued by the city of Buffalo, under the act of 1853, where the city had purchased grounds for a market site for the sum of $3,500. The common council passed a resolution to effect such purchase, and to issue to the grantor the bonds of the city for that sum, payable at the expiration of 25 years, with interest semiannually. Selden, J., writing the opinion, discussed the nature of a "funded debt," in the following language (page 367):

"Is this, then, a 'funded debt'? If we rely for a definition of these terms, either upon lexicographers or financial writers, it is clear that this is not a funded debt. The term 'fund' was originally applied to a portion of the national revenue set apart or pledged to the payment of a particular debt. A 'funded debt,' therefore, was a debt for the payment of the principle (sic) or interest of which some fund was appropriated. Bouvier says, 'Funded debt is that part of the national debt for which certain funds are appropriated towards the payment of the interest;' and this definition corresponds substantially with that given by all writers on the subject. The term 'funding,' however, has been sometimes applied in this country to the process of collecting together a variety of outstanding debts against corporations, the prin-

cipal of which was payable at short periods, and borrowing money upon the bonds or stocks of the corporation to pay them off; the principal of such bonds or stocks being made payable at periods comparatively remote. But I am not aware that, even in common parlance, the term has ever been made use of to describe an ordinary debt, growing out of a transaction with one individual, and represented by a single instrument, as in this case. I think it is essential to the idea of a 'funded debt,' even under the broadest use of that term, that the debt should be divided into parts or shares, represented by different instruments, so that such parts or shares may be readily transferable. The act of 1835 contemplates three classes of debts. Of these, funded debts constitute one class, temporary loans another, and all other debts a third."

Wright, J., however, in the concurring opinion, said (pages 378, 379):

"The statute expression is, 'No funded debt shall be contracted,' etc. The debt created by the purchase of the market grounds was not, in any sense of the expression, a 'funded debt'; nor is it apparent that in the use of the term the legislature intended to include any permanent debt payable on time, with interest, whether for money borrowed or otherwise. We are rather to understand the expression to have been used in the sense and indicating the meaning in which it had been previously and ordinarily used and understood by legislators and the commercial world. A 'funded debt' has a well-defined signification. The funding of a debt is the pledging of a specific fund to keep down the interest, and ultimately discharge the principal. 1 Bouv. Law Dict. 551; 1 McCul. Dict. 689; 1 Enc. Am. 337. The benefits arising from a funded debt differ materially from the ordinary obligations of a state or corporation to pay money. In the latter case there need be no pledge or collateral security for payment. But a funded debt rests on some pledge of the public or corporate revenue or property, which is set apart as a fund to keep down the interest and extinguish the principal of the debt. When the extinguishment of the debt is contemplated, it is called a 'sinking fund,' and it is so denominated in the act of 1853. The funding system is resorted to for the improvement of public or corporate credit, by giving creditors a specific lien either upon revenues or property. It is, in effect, a mortgage. The third section of the act of 1853 limits the whole amount of debt which a municipal corporation may owe. The fifth section relates to another subject, and regulates the manner of contracting a particular description of debt, viz. a 'funded debt.' Though the expression, 'funding a debt,' has been sometimes incorrectly used to signify the aggregating of numerous floating debts of a municipal corporation, created at different times and upon different considerations, and borrowing money upon bond to pay off the whole, yet even that use of the expression does not embrace this case. In those instances the law contains what may be denominated a funding clause or section, imposing an obligation upon the corporation to raise by tax the amount, as therein directed, to pay the interest and principal of the loan."

Aside from this case, I can find no authority upon the question. We are therefore relegated to the general municipal law to ascertain whether there is a definition or description of a funded debt. The headings of the sections read: (Section 4) "Temporary Loans." (Section 5) "Funded Debt." (Section 6) "Payment of Municipal Bonds." (Section 7) "Funded and Bonded Debts." But the body of the statute nowhere draws, in words, a definitive distinction between the classes. The temporary loan seems to be one which is to be paid with and by the taxes of a current fiscal year, while the funded debt seems to be one where provision is to be made for the annual raising by tax of the sum necessary to pay the interest and principal as they respectively mature. I think the legislature intended to include in the term "funded debt" all municipal indebted-

ness embraced within, or evidenced by, a bond, the principal of which is payable at a time beyond the current fiscal year of its issue, with periodical terms for the payment of interest, and where provision is made for payment by the raising of the necessary funds by future taxation, and the quasi pledging in advance of the municipal revenue. And this, I think, is consistent and in accord with the definition of Judge Selden, that it is essential to the idea of a funded debt that it should be divided into parts or shares, represented by different instruments, so that such parts or shares may be readily transferable. In this view I am confirmed by what may be termed the commercial understanding of the words "funded debt." Under the title of "National Debt," the Encyclopædia Britannica says:

"When a state has a variety of loans at varying rates of interest, it may consolidate them into a single debt at a uniform interest. For example, in 1751 several descriptions of English debt were consolidated into one fund, bearing a uniform interest of 3 per cent.,—an operation which gave origin to the familiar term 'consols' ('consolidated funds'). In the early days of the English national debt, a special tax or fund was appropriated to the payment of the interest on each particular loan. This was the original meaning of 'funds',—a term which has now come to signify the national debt generally. So, also, the origin of the term 'funded,' as applied to a debt which has been recognized as at least quasi permanent, and for the payment of the interest on which regular provision is made. Unfunded or floating debt, on the other hand, means, strictly, loans for which no permanent provision requires to be made, which have been obtained for temporary purposes, with the intention of paying them off within a brief period. Exchequer and treasury bills are included in this category, and such other moneys in the hands of a government as it may be required to reimburse at any moment. Where a government is the recipient of savings-banks deposits, these may be included in its floating debt; and so, also, may the paper money which is issued so largely by some governments. The unfunded debt of England is comparatively small, while in Austria and some other states it has attained formidable and embarrassing dimensions. A state with an excessive floating debt must be regarded as in a very critical financial condition."

In Rawle's edition of Bouvier's Law Dictionary, at page 862, under the heading "Funding System," it is said:

"The national debt of England consists of many different loans, all of which are included in the term funds. * * * In America the funding system has been fully developed. The general government, as well as those of all the states, have found it necessary to anticipate their revenue, for the promotion of public works and other purposes. The many magnificent works of internal improvement which have added so much to the wealth of the country were mainly constructed with money borrowed by the states. The canals of New York, and many railroads in the Western states, owe their existence to the system. The funding system enables the government to raise money in exigencies, and to spread over many years the taxation which would press too severely on one."

One of the shortest and pithiest opinions ever reported may be found in Houghton v. Gilbart, 7 Car. & P. 701, where a question arose as to the meaning of the word "cargo." One of the counsel was referring to the then standard dictionary, when Chief Justice Tindal interrupted him, saying:

"It is a question of mercantile construction. You had better lay aside your dictionary, and appeal to the knowledge of the jury; for, after all, the dictionary is not authority."

52 N.Y.S.—50

The "jury" to whose knowledge we must appeal in the present inquiry is the legislature, for we are seeking its intention in its enactment upon the subject of the creation of a funded debt by a county. The legislature has especially authorized counties to borrow money, in advance of tax, for payment of the cost of construction of certain public improvements, and the issuing of bonds in payment of the loan. Wherever a funded debt is to be created under the section headed "Funded Debt," the legislature has declared that the resolution ordering it must be passed by a two-thirds vote of the members elected to the board of supervisors, or the question must be submitted to and approved by the electors of the county; and in this case there has been neither a two-thirds vote, nor an approval by the electors. As the subject of the resolution in question seems to fall within the provision above referred to, I am of the opinion that the debt falls within the .class of funded debts, and requires the vote of two-thirds of all the members of the board of supervisors.

It follows that the resolution of the board of supervisors directing the issue of the bonds in question was invalid; and we direct judgment in accordance with the demand of the defendant. that the resolution of the board of supervisors directing the issue of county bonds to the amount of $64,978 is invalid.

Judgment for defendant on agreed statement of facts. All concur.