12 N.Y.2d 379 (1963)
Courtesy Sandwich Shop, Inc., et al., Respondents,
v.
Port of New York Authority et al., Appellants; Arthur J. Sills, Attorney-General of the State of New Jersey, Intervenor-Appellant.
In the Matter of the Application of the Port Authority Trans-Hudson Corporation, Appellant, Relative to Acquiring Title to Real Property in the State of New York and the State of New Jersey for Hudson Tubes Purposes. Courtesy Sandwich Shop, Inc., et al., Respondents; Louis J. Lefkowitz, Attorney-General of the State of New York, Intervenor-Appellant.
Court of Appeals of the State of New York.
Argued February 28, 1963.
Decided April 4, 1963.
Daniel B. Goldberg, Sidney Goldstein, Rosaleen C. Skehan, Joseph Lesser, Patrick J. Falvey, Isobel E. Muirhead, Lewis H. Sandler and Anthony J. Raiola for Port of New York Authority and others, appellants in the above-entitled action.
Louis J. Lefkowitz, Attorney-General of the State of New York (Samuel A. Hirshowitz and Daniel M. Cohen of counsel), in his statutory capacity under section 71 of the Executive Law.
Arthur J. Sills, Attorney-General of the State of New Jersey (Theodore I. Botter of counsel), intervenor-appellant pro se.
Edward S. Greenbaum, Roger Bryant Hunting, Morris L. Ernst, Leo Rosen, Louis W. Bookheim, Jr., W. Bernard Richland and I. Lee Merin for respondents.
David W. Peck, Herman T. Stichman, Theodore N. Tarlau, John C. Jaqua and Michael A. Cooper for Hudson & Manhattan Corporation and another, amici curiæ.
Boyle, Feller & Reeves for West Side Association of Commerce, Inc., amicus curiæ.
Robert E. Littlefield for Commerce and Industry Association of New York, Inc., amicus curiæ.
Charles W. Merritt, Louis M. Loeb and Jack P. Jefferies for New York Chamber of Commerce, amicus curiæ.
Chief Judge DESMOND and Judges DYE, FULD, FOSTER and SCILEPPI concur with Judge BURKE; Judge VAN VOORHIS dissents in a separate opinion.
*387 BURKE, J.
Chapter 209 of the Laws of New York, 1962, together with concurrent New Jersey legislation (Laws of N. J., 1962, ch. 8), authorizes the Port of New York Authority, through the appellant subsidiary, to effectuate a single port development project to consist of the present Hudson & Manhattan Railroad system and a new development to be known as the "World Trade Center", all on a site in lower Manhattan, part of which is now occupied by the existing Hudson & Manhattan Terminal. Appellant is authorized to condemn property to achieve this purpose and, under this power, instituted the condemnation proceeding here challenged by respondents, who have an interest in the subject property. Respondents argue that chapter 209 violates section 7 of article I of the New York Constitution and the United States Constitution (Matter of Hopper v. Britt, 203 N.Y. 144, 149; Missouri Pacific Ry. v. Nebraska, 164 U. S. 403) in that it authorizes the taking of private property by eminent domain for other than a public use.
The proposed World Trade Center is defined by statute as that part of the unified project that is "a facility of commerce * * * for the centralized accommodation of functions, activities and services for or incidental to the transportation of persons, the exchange, buying, selling and transportation of commodities * * * in world trade and commerce * * * governmental services". It also states that as far as structures are concerned the World Trade Center also includes any such structure not devoted to railroad functions (thus preserving the distinction between the Hudson & Manhattan part of the project and the World Trade Center functions) even though portions of such structures are not functionally related to the project's purpose and are used solely for "the production of *388 incidental revenue * * * for the expenses of all or part of the port development project" (ch. 209, § 2).
All of the Appellate Division Justices are agreed that the World Trade Center concept represents a public purpose. The majority found, however, the statute was on its face unconstitutional, in that the act granted a power to condemn property to be used for no other purpose than the raising of revenue for the expenses of the project, and for a class of tenants with a remote relationship with world trade. These conclusions were drawn from the inclusion in the definition of the term "incidental". The definition refers to "incidental" revenue and "functions * * * incidental to * * * the exchange, buying, selling * * * of commodities * * * in world trade and commerce". The dissent read the definition as not including the power to condemn any independent areas separately accommodating only incidental revenue tenants not related to the World Trade Center concept. Therefore, it found that revenue production was incidental and not the primary purpose of the taking.
The prime issue, then, is whether the language of the act must be interpreted so as to authorize condemnation for the production of revenue without subordination to any primary purpose. If that is so the act goes beyond what the cases authorize (Bush Term. Co. v. City of New York, 282 N.Y. 306; Kaskel v. Impellitteri, 306 N.Y. 73; Cannata v. City of New York, 11 N Y 2d 210, app. dsmd. 371 U. S. 4) and beyond what can be constitutionally permitted. We think that the statute is valid.
The Appellate Division has stated that the concept of the World Trade Center is a public purpose. We understand this to mean that any use of the property sought to be condemned that is functionally related to the centralizing of all port business is unobjectionable even though private persons are to be the immediate lessees. The "concept" referred to by the Appellate Division can mean only that. It is the gathering together of all business relating to world trade that is supposed to be the great convenience held out to those who use American ports and which is supposed to attract trade with a resultant stimulus to the economic well-being of the Port of New York. This benefit is not too remote or speculative as to render the means chosen to achieve it patently unreasonable; nor is the benefit sought *389 itself an improper concern of government. The history of western civilization demonstrates the cause and effect relationship between a great port and a great city. (See Pirenne, Economic and Social History of Medieval Europe, [Harcourt, Brace & Co., N. Y.].) Fostering harbor facilities has long been recognized by this court as the legitimate concern of government. (Matter of Mayor of City of N. Y., 135 N.Y. 253.) Even the centralization of inland trade has supported the exercise of the power of eminent domain for the establishment of public markets wherein private merchants plied their trades. (Matter of Cooper, 28 Hun 515, app. dsmd. 93 N.Y. 507; Peterson v. Mayor of City of N. Y., 17 N.Y. 449; Ketchum v. City of Buffalo, 14 N.Y. 356.) More recently the indirect benefits deriving from slum clearance and from a "plan to turn a predominantly vacant, poorly developed and organized area into a site for new industrial buildings" have justified condemnation (New York City Housing Auth. v. Muller, 270 N.Y. 333; Cannata v. City of New York, 11 N Y 2d 210, 215, supra). To retreat from the public importance of piers, markets and slum clearance, even esthetic improvements have been held to be a public purpose justifying condemnation (Berman v. Parker, 348 U. S. 26). No further demonstration is required that improvement of the Port of New York by facilitating the flow of commerce and centralizing all activity incident thereto is a public purpose supporting the condemnation of property for any activity functionally related to that purpose. Nor can it be said that the use of property to produce revenue to help finance the operation of those activities that tend to achieve the purpose of the project does not itself perform such a function, provided, of course, that there are in fact such other activities to be supported by incidental revenue production (Bush Term. Co. v. City of New York, 282 N.Y. 306, supra). The crux of the problem here, however, is that the statute has been read by the Appellate Division as allowing unfettered erection of structures that are solely revenue producing. As the dissent below maintains, this misreads the statute. The act was construed so as to raise rather than settle a constitutional question. We have said that where there are two possible interpretations the court will accept that which avoids constitutional doubts. (Kauffman & Sons Saddlery Co. v. Miller, 298 N.Y. 38, 44; Matter of Coates, 9 N Y 2d 242, 253.) *390 The act may properly be read to authorize only incidental extensions of a site required for a public use. This is best understood not by reference to only portions of the language of the statute but by reading all the language in context as an entire definition.
The entire definition follows: "`World trade center' shall mean that portion of the port development project constituting a facility of commerce consisting of one or more buildings, structures, improvements and areas necessary, convenient or desirable in the opinion of the port authority for the centralized accommodation of functions, activities and services for or incidental to the transportation of persons, the exchange, buying, selling and transportation of commodities and other property in world trade and commerce, the promotion and protection of such trade and commerce, governmental services related to the foregoing and other governmental services, including but not limited to custom houses, customs stores, inspection and appraisal facilities, foreign trade zones, terminal and transportation facilities, parking areas, commodity and security exchanges, offices, storage, warehouse, marketing and exhibition facilities and other facilities and accommodations for persons and property and, in the case of buildings, structures, improvements and areas in which such accommodation is afforded, shall include all of such buildings, structures, improvements and areas other than portions devoted primarily to railroad functions, activities or services or to functions, activities or services for railroad passengers, notwithstanding that other portions of such buildings, structures, improvements and areas may not be devoted to purposes of the port development project other than the production of incidental revenue available for the expenses of all or part of the port development project." (Laws of N. Y., 1962, ch. 209, § 2.)
Even without resort to familiar canons of construction that control when a statute is called into question on constitutional grounds, the statute, it seems to us, allows only "portions" of structures otherwise devoted to project purposes to be used for "the production of incidental revenue * * * for the expenses of all or part of the port development project." Thus considered it does not vitiate the public purpose of the development as a whole. (Bush Term. Co. v. City of New York, 282 N.Y. 306, supra.) *391 As to the fears expressed by the respondents that the Port Authority may illegally seize a particular piece of property for an unauthorized nonpublic use, it is sufficient to say that the condemnation procedures prescribed by statute fully protect the respondents and others in like position against any taking for nonpublic purposes in violation of the Port Development Project Law.
Respondents also argue that chapter 209 is unconstitutional (under the compact clause, U. S. Const., art. I, § 10) because no additional congressional consent has been obtained for this bi-State legislation. This argument must fail because, assuming consent to be required for this sort of concurrent action, the congressional consent originally given in 1921 and 1922 to the bi-State compact creating the Port Authority expressly contemplated such further co-operative legislation in furtherance of port purposes as was here accomplished. (Pub. Res. No. 17, 67th Cong., 1st Sess., 42 U. S. Stat. 174; Pub. Res. No. 66, 67th Cong., 2d Sess., 42 U. S. Stat. 822.) Among the Articles of Agreement consented to were articles III, VII and VI, which created the Port Authority with the powers enumerated plus "such other and additional powers as shall be conferred upon it by the legislature of either state concurred in by the legislature of the other". Similarly, article XI, following the agreement for an initial comprehensive plan in article X, provides that the Port Authority should "from time to time make plans for the development of said district, supplementary to or amendatory of any plan theretofore adopted, and when such plans are duly approved by the legislatures of the two states, they shall be binding upon both states with the same force and effect as if incorporated in this agreement." Chapter 209 clearly falls within the congressional consent given to the articles contemplating the grant to the Port Authority of additional powers within the framework of the compact.
Respondents' contention that the statute is an unconstitutional rule of law because it does not recognize business good will as an item to be considered in valuation is not well taken. Not only is such an argument premature since the statute is general in terms and a trial on valuation is yet to be had, but the noncompensability of good will is settled by our decisions. (Banner Milling Co. v. State of New York, 240 N.Y. 533.) *392 Kimball Laundry v. United States (338 U. S. 1), cited by respondents, is not in point. There it was merely held that where the Federal Government took over a laundry business for a short period, and where the going concern was to be continued rather than using the land for a different purpose, the Fifth Amendment required payment for the going concern value.
Respondents' other contentions regarding the powers of the subsidiary corporation used by the Port Authority to acquire the subject property need not long detain us. Contrary to respondents' position, the subsidiary has been granted the power of eminent domain. Sections 14 and 16 of chapter 209 expressly so provide. The prohibition in section 12 against the contraction of indebtedness by the subsidiary does not detract from the express grant of the power to condemn. We have often held that all portions of a statute must be given effect in a harmonious construction. (Matter of Dowling, 219 N.Y. 44, 56; Matter of Kaplan v. Peyster, 273 N.Y. 147, 149-150; Matter of Tonis v. Board of Regents, 295 N.Y. 286, 293.) The prohibition directed against the contraction of indebtedness should not derogate from a grant reading: "The powers hereby vested in the port authority and in any subsidiary corporation * * * (including but not limited to the power to acquire real property by condemnation) shall be continuing powers". Respondents' claim to a hearing before making the determination to take this property for a public purpose is equally without merit. Any provision for a hearing contained in section 1 of chapter 623 of the Laws of 1924 was conditioned, as usual, on New Jersey's concurrence which was consistently denied by that State. The identification of respondents' property was made by the Legislatures themselves in the statutes authorizing this project and no hearing could change this fact. The only hearing to which respondents are entitled (Fifth Ave. Coach Lines v. City of New York, 11 N Y 2d 342) has been given in the instant proceedings wherein full opportunity has been afforded respondents to raise their objections.
Lastly, we do not agree with the objection raised in the concurring opinion of Justice STEUER that the authority given appellant to go ahead immediately with the Hudson Tubes portion of the project in advance of any taking for the World Trade Center violates the legislative determination of inseparability, *393 because it may eventually appear that the World Trade Center is impossible of fulfillment. The Legislature decided that the two are inseparable. It also directed the Port Authority to "proceed as rapidly as may be practicable to accomplish the purposes of this act." Appellant is given no discretion to abandon the World Trade Center; legally it is obliged to create it. Impossibility that may arise because of external circumstances is a matter for the Legislature to consider when it authorizes the project, not a subject for this court to speculate upon and conclude that appellant is thereby given power to sever the project in violation of statutory command.
The orders appealed from should be reversed, the orders of Special Term in the condemnation proceeding reinstated, a judgment rendered that chapter 209 of the Laws of 1962 is constitutional, and the certified question answered in the negative.
VAN VOORHIS, J. (dissenting).
This statute (L. 1962, ch. 209), as drafted, includes a great deal more than the sponsors of a World Trade Center were talking about, and renders it in my opinion subject to the constitutional defects which the Appellate Division has found. These provisions, as analyzed and criticized by the Appellate Division, appear to have been due to no inadvertence; they bear every indication of having been consciously and deliberately inserted so as to grant to the Port Authority extensive and uncontrolled governmental power to condemn and manage private real property for private purposes as a major object of the act.
The cases upholding the constitutionality of public ownership and maintenance of piers in the Hudson River (Matter of Mayor of City of N. Y., 135 N.Y. 253, 263) or public markets or world's fairs or airports (Matter of Cooper, 28 Hun 515, app. dsmd. 93 N.Y. 507; Hesse v. Rath, 249 N.Y. 436; Kennedy & Co. v. New York World's Fair, 288 N.Y. 494) are wide of the mark. This statute puts the Port Authority in the real estate business, by making it a potential landlord, as it says itself at page 6 of its own brief, of "a community of firms engaged in direct import-export activities and it is hoped that they will establish quarters in the World Trade Center and use the Port of New York for increasing volumes of cargo. These include some share of the 200 combination export managers, 2000 general exporters, 4200 general importers and in addition, 2900 United States manufacturers *394 responsible for seventy-six per cent of current United States exports." These are in addition, the Port Authority's brief says, to "over 100 banking organizations financing world trade."
All of these and many more private activities, the Authority contends on this appeal, become public purposes if only they are "centralized" in some nebulous manner in the 13 blocks on the west side of lower Manhattan within which the Hudson & Manhattan terminal is located. This selected area was transferred from the east side, where it had been located by chapter 312 of the Laws of 1961, including the New York Stock Exchange, which apparently is no longer deemed to be one of the financial organs of world trade that needs to be "centralized."
Nothing in the statute indicates by what standard of judgment selection is to be made from among this multitude of private organizations engaged in export and import for location in this area. It is suggested that priority should be given to the United States Custom House, "the heart of the entire centralization concept" (appellant's brief, p. 19), but, apart from the anomaly of this instrumentality of New York and New Jersey spending State money for the construction of Federal buildings, the Federal Government says that it is constructing its own new building in Foley Square, where the Customs Court and many of its other activities will be located and that no arrangements have been made with the Port Authority for occupancy with the World Trade Center.[*] Emphasis has been placed upon United States appraisers' stores, customs brokers, freight forwarders and the like. But we have to read the statute, not merely proclamation of administrative policy, since constitutionality is determined by what can be done under a statute not by what may be attempted (Rosalsky v. State of New York, 254 N.Y. 117, 121). Respondents' brief points to the quantity of space occupied in New York City for foreign trade, and the impossibility of condensing it into this area of 13 blocks, and questions by what principle private firms are to be selected for location there (pp. 36-37):
"For example, the Empire State Building advertises that it is `World Headquarters' for foreign firms. It issues a pamphlet *395 giving a `Statement of facts for foreign firms, importers and exporters.' In this it says that `More than 100 foreign firms have their offices in the Empire State Building.' It lists the names of these firms, which it says have `A world-famous business address for major firms from the six continents.'
"But this is not the only building in New York City claiming to serve this purpose. The huge Pan-American Building, just north of Grand Central Station, makes similar claims. This building, `The Commerce Capital', is surpassed in size only by the Pentagon in Washington and the Merchandise Mart in Chicago. It has just (March 7, 1963) been dedicated in ceremonies reflecting its ownership and financing by American and British interests, its importance underscored by the presence of the Secretary of Commerce and his British counterpart. These are but two of the many New York buildings seeking to house businesses engaged in foreign trade. And the New York Classified telephone directory indicates many, many classifications of business activity which would most surely be eligible for inclusion in the Port Authority's vast real estate complex.
"When one becomes `acclimatized' to the vast `concept' of the World Trade Center, one must answer the question: What will be the effect on our economic structure of the colossal upheaval which it seeks to attain? The project on this site was conceived almost overnight and is now claimed to represent the mature judgment of the Legislatures of New Jersey and New York. Surely it must be examined in the light of what the statute itself says, and not on the basis of a general idea, notion or concept."
This raises constitutional questions, if the Constitutions any longer protect private property.
When one examines the statute, as the Appellate Division did, and contrasts its provisions with much that has been loosely stated about this "concept", it discloses a fundamental purpose  not one which is "incidental". "World Trade Center" is defined in section 2 of the act as consisting of any quantity of structures or areas within the 13-block tract, "convenient or desirable in the opinion of the port authority for * * * functions, activities and services for or incidental to * * * the exchange, buying, selling and transportation of commodities or other property in world trade and commerce, the promotion *396 and protection of such trade and commerce, governmental services related to the foregoing, and other governmental services, including but not limited to" etc.
"Exercising this power", the opinion of the Appellate Division accurately states (17 A D 2d, pp. 598-599): "would indeed make this project, in reality, what the appellants call a real estate development. It is so broad that it is difficult to think of any enterprise, or any business in the City of New York, which could not find a home within the condemned area, although devoted exclusively to private purposes. * * * There are very few, if any, commercial buildings, within the City of New York that do not house enterprises of the nature contemplated." It is incredible that, under a free enterprise system, the "centralization" of these multifarious activities could transform the housing of them from private to public purposes within the application of the law of eminent domain. That a project may be desirable or that it may have some indirect public benefit is not the equivalent of a public purpose (Matter of New York City Housing Auth. v. Muller, 270 N.Y. 333, 343).
The Appellate Division well stated (17 A D 2d, p. 595): "To conclude otherwise could well result in a rule of law that the power of eminent domain may be exercised in almost any situation where some nexus with the public good may be established."
Of course, if the "centralizing" of these private functions of foreign commerce be deemed to be a public purpose, then the rental obtained from the buildings or offices would be of the essence of the project, and not merely "incidental", and so could be utilized to offset the deficits of operating the Hudson & Manhattan Railroad. That means that being engaged in foreign trade, in some capacity, transforms a private entrepreneur into one conducting a public purpose if it is selected by the Port Authority as one from among many to be housed in the project area. On this uncertain principle depends the constitutionality of this whole statute. The Appellate Division was correct in stating that under the powers conferred by this statute the Authority could use nine tenths of the 13 blocks for obtaining revenue to offset the revenue deficits of the Hudson & Manhattan provided only that they were rented to private manufacturers, traders, or other entrepreneurs whose activities were *397 being "centralized", i.e., to whom the Authority decided to rent space in the project area.
The Chairman and the Executive Director of the Port Authority have had occasion publicly to take inventory of the causes of the relative decline of New York Harbor among eastern coastal ports, ascribing its comparative deterioration to other factors than "concentration" of export and import activities (S. Sloan Colt, Chairman, New York Herald Tribune, May 25, 1962; Austin J. Tobin, Christian Science Monitor, Dec. 24, 1962).
Regardless of whether some activities might be concentrated to advantage, mainly of a governmental nature, if the statute had been limited to them, it is inconceivable that all of these private activities or even a major portion of them could be concentrated in an area of 13 blocks. If this statute be constitutional, the Legislature could amplify the 13 blocks to include any larger area in the City of New York. If this could be done in connection with foreign commerce, it could be accomplished constitutionally with domestic commerce in case of this or any other city that might be deemed to be losing its relative economic position.
The courts of other States have had occasion to rule upon the constitutionality of legislation of this character, holding it to be invalid (Matter of Opinion of Justices, 332 Mass. 769 [1955]; Hogue v. Port of Seattle, 54 Wn. [2d] 799 [1959]; Opinion of Justices, 152 Me. 440 [1957]; Opinion to Governor, 76 R. I. 365).
State v. Inter-American Center Auth. (84 So. 2d 9 [Fla., 1955]; 143 So. 2d 1 [Fla., 1962]) is not to the contrary, inasmuch as the Authority which was there involved was limited to educational and scientific purposes in strengthening cultural relations among the countries of the western hemisphere. If the New York Port Authority had been content with powers like that, this litigation would not have arisen.
Much has been said in argument and in the briefs about the importance of the Port of New York and the desirability of maintaining its competitive position on the eastern seaboard. Chambers of Commerce and other organizations have joined in this refrain. Quite possibly the kind of trade center which they have been thinking about would be an asset, if the statute had been drawn in that way. It may well be that the Port of New *398 York Authority, traditionally jealous of its solvency, was unwilling to take over the Hudson & Manhattan Railroad without the World Trade Center, and thus help meet its deficits by expropriating the good will and condemning the real estate of private property owners instead of by general taxation. It taxes credulity, however, to believe that the Authority would insist upon taking over two insolvent operations simultaneously, if it really considered that the World Trade Center would not meet its own expenses for 10 years as the Authority's brief says at page 56.
This is not all a matter of policy for the Legislature. It is the function of courts to give effect to the Constitutions, State and Federal. It is the solemn duty of courts to enforce the constitutional limitation against taking private property by eminent domain except for public purposes. It is idle to suggest that respondents and others in like position are protected by condemnation procedures against taking for nonpublic purposes, inasmuch as the effect of the majority decision is to characterize the condemnation of any real estate in this 13-block area as being for a public purpose. What constitutes private property or public purposes changes from time to time, but the basic concept of private property does not change. If powers such as these be upheld to condemn property in good condition which is not potentially slum (cf. Cannata v. City of New York, 11 N Y 2d 210), without even paying for the good will, what may appear to be for the advantage of the New York City Chamber of Commerce or the Downtown Lower Manhattan Association or the New Jersey State Chamber of Commerce, or the Chambers of Commerce of Jersey City or Newark today may be turned against them tomorrow, as their counterparts learned in other countries to their sorrow and dismay after they had surrendered to the collectivist state. This ever-growing ascendancy of government over private property and over free enterprise is no respecter of persons and cannot long be harnessed by those who expect to use it for private ends. As governmental ascendency is increasingly sanctioned by the constitutional law of our State, private capital is less likely to be invested to develop the Port of New York and more likely to fold its tents and silently move toward other States where government competition and expropriation are more restricted. As the cases show that have *399 been previously cited, the power of government in these respects has been curbed by the courts of other States.
Disregard of the constitutional protection of private property and stigmatization of the small or not so small entrepreneur as standing in the way of progress has everywhere characterized the advance of collectivism. To hold a purpose to be public merely for the reason that it is invoked by a public body to serve its ideas of the public good, it seems to me, can be done only on the assumption that we have passed the point of no return, that the trade, commerce and manufacture of our principal cities can be conducted by private enterprise only on a diminishing scale and that private capital should progressively be displaced by public capital which should increasingly take over. The economic and geographical advantages of the City of New York have withstood a great deal of attrition and can probably withstand more, but there is a limit beyond which socialization cannot be carried without destruction of the constitutional bases of private ownership and enterprise. It seems to me to be the part of courts to enforce the constitutional rights of property which are involved here.
The World Trade Center, as conceived by chapter 209 of the Laws of 1962, also violates article I (§ 10, subd. 3) of the United States Constitution, as it seems to me, which provides that no State shall enter into any agreement of compact with another State without the consent of the Congress. The 1921 compact between New York and New Jersey, to which congressional consent was obtained (42 U. S. Stat. 174), provides that the Port Authority is authorized to purchase, construct, lease and operate "any terminal or transportation facility" and "for any of such purposes to own, hold, lease and/or operate real or personal property" (L. 1921, ch. 154, § 1, art. VI; italics supplied). The language of chapter 209 of the Laws of 1962 as well as the Port of New York Authority's prospectus demonstrate that this is neither a terminal nor transportation facility (cf. Bush Term. Co. v. City of New York, 282 N.Y. 306, 316). Centralization of the far-flung export and import enterprises in 13 blocks in lower Manhattan, even if that were possible and even if it were a public purpose, would not constitute a terminal or transportation facility. The congressional consent in 1921 to "such other and additional powers as shall be conferred upon *400 [the Port Authority] by the legislature of either state concurred in by the legislature of the other" can hardly be construed as extending beyond such as are incidental to terminal or transportation facilities. Injecting the Port Authority into a huge project to compete with private enterprise in the real estate field, for the supposed purpose of maintaining the ascendency of New York over eastern coastal seaports in other States, is outside of the original compact between New York and New Jersey.
The orders of the Appellate Division appealed from should be affirmed.
In the declaratory judgment action: Order reversed, without costs, and matter remitted to Special Term for entry of a judgment that chapter 209 of the Laws of 1962 is constitutional. Question certified answered in the negative.
In the condemnation proceeding: Order of Appellate Division reversed and that of Special Term reinstated, without costs.
NOTES
[*] See letter from the United States General Services Administration submitted by respondents (brief, pp. 75-76).