84 So.2d 9 (1955)
STATE of Florida and the taxpayers, property owners and citizens thereof, including nonresidents owning property or subject to taxation therein, Appellants,
v.
INTER-AMERICAN CENTER AUTHORITY, a public corporation and an agency of the State of Florida, Appellee.
Supreme Court of Florida. En Banc.
December 13, 1955.
*10 George A. Brautigam, State Atty., Miami, and John S. Lloyd, Asst. State Atty., Tallahassee, for appellants.
Richard W. Ervin, Atty. Gen., and Phillip Goldman, Asst. Atty. Gen., for appellee.
TERRELL, Justice.
The Legislature of 1951 enacted Chapter 26614, now Chapter 554, Florida Statutes, F.S.A., creating the Inter-American Center Authority (hereinafter referred to as the Center Authority) as an agency of the state, ratifying and confirming the members of said Authority, prescribing the jurisdiction, powers and duties of said Authority, authorizing it to construct, maintain, operate and provide for the establishment, construction and operation of an Inter-American Cultural and Trade Center hereinafter referred to as the Trade Center, in or near the City of Miami as a permanent enterprise, to acquire land and buildings to operate said Trade Center, to issue revenue bonds without pledging the credit of the state or any subdivision thereof to pay them and for other purposes. Said Act also authorized the State Road Department to designate all roads within the Trade Center and approaching it as a part of the state road system and to expend state road funds to construct, reconstruct, improve, repair and maintain said roads as part of the state road system.
Chapter 26614 was amended by the following acts: Chapter 29830, Acts of 1955, granting Center Authority additional powers, including the right to fix and collect charges for admission to the Trade Center, such right not to be affected by the construction or the improvement of roads in or approaching the Trade Center; Chapter 29828, Acts of 1955, F.S.A. § 554.27, providing for a foreign trade zone within the Trade Center; Chapter 29827, Acts of 1955, F.S.A. § 210.20, providing for payment to the Trade Center of cigarette taxes collected on cigarettes sold at retail on property of the Trade Center, less 2 1/2% for administration; Chapter 29829, Acts of 1955, F.S.A. § 561.20, amending Sec. 561.20, Florida Statutes, to permit the issuance of not exceeding three liquor licenses to qualified applicants within the Trade Center. Chapter 30990, Sp. Acts of 1955, authorizing the City of Miami to sell and convey to the Center Authority properties in Dade County known as "The Graves Tract" and then authorized said Center Authority to lease or trade any part of said property for any lawful purpose of the Center Authority and in turn authorized the City of Miami to construct any buildings or structures on the property so conveyed upon terms and conditions mutually agreeable.
In 1954 the Center Authority employed Ebasco Services Incorporated, a nationally recognized firm of consulting engineers, to prepare a report on the feasibility of constructing an Inter-American Cultural and Trade Center in Dade County. In October 1954, Ebasco Services Incorporated filed its report recommending construction of the proposed Inter-American Cultural and Trade Center on sites including The Graves Tract at the upper end of Biscayne Bay, which recited their estimates of cost *11 and capital requirements, their estimate of revenues it would produce, the cost of operation and maintenance expenses. The report recommended that construction of the proposed Trade Center was feasible and that it would be self-liquidating. The Ebasco report also found "the functional purpose of the proposed center is to increase trade and strengthen cultural relations among the nations of the Western Hemisphere. This objective is to be accomplished mainly through industrial, commercial, educational and cultural exhibits of countries of the Western Hemisphere and other nations. The project is to be self-sustaining and self-liquidating and to assure adequate attendance and income, concessions are to be granted and attractions provided which will result in operations with mass appeal comparable to those of the New York and Chicago World's Fair." The report, pages 5-6, then goes on in more detail to define the ways and means by which these results may be accomplished.
August 5, 1955, the Center Authority adopted a resolution authorizing the issuance of bonds and the execution of a trust indenture securing them, the trust indenture being included in the bond resolution. The resolution and the trust indenture provided for the issuance of $70,000,000 in the bonds of the Center Authority to pay the cost of the Trade Center, such bonds to consist of two series, $43,000,000 to be designated "Inter-American Cultural and Trade Center Revenue Bonds, Series A" and $27,000,000 to be designated "Inter-American Cultural and Trade Center Revenue Bonds, Series B," said bonds to be dated June 1, 1955, and to mature December 1, 1985, subject to redemption on or after December 1, 1961, Series A Bonds at premiums ranging downward from 6% and Series B Bonds at premiums ranging downward from 12%; Series A Bonds also subject to redemption on or after June 1, 1958, at a premium of 4% as defined in the trust indenture which provides the manner in which both series of bonds be expended. Notice and order to show cause was seasonably given and published, the state attorney on behalf of the State of Florida answered and at final hearing the court entered the decree dated September 9, 1955, validating the bonds. This appeal is from the validating decree.
It is first contended that the validation decree was unauthorized and unnecessary because Chapter 554, Florida Statutes, F.S.A., enables the Center Authority to issue bonds without any other proceedings.
It is true that Sec. 554.08(2), Florida Statutes, F.S.A., provides that "such bonds may be issued without any other proceedings," but it does not prohibit validation proceedings and Sec. 554.18, Florida Statutes, F.S.A., provides that bonds issued by the Center Authority "may be validated and confirmed by the circuit court of Dade county under the provisions of Chapter 75, Florida Statutes," which applies to every kind of a taxing unit known to the state "including also state agencies, commissions and departments authorized by law to issue bonds may, if deemed expedient, determine its authority to incur bonded debt or issue certificates of indebtedness and the legality of all proceedings in connection therewith, including proper cases, any assessment of taxes levied or to be levied, the lien of such taxes, and of proceedings or other remedies for their collection."
In State v. City of Miami, 113 Fla. 280, 152 So. 6, 8, this court reviewed the history and purpose of the validation statute, Chapter 75, Florida Statutes, F.S.A., and since that decision it appears that Sec. 75.02 was amended in 1949 to include state agencies, commissions and departments authorized to issue bonds. So whether it was "necessary" to validate the bonds in question was a matter for the Center Authority to decide and having so decided, the court was authorized to entertain jurisdiction of the validation proceedings. It is now the universal practice to validate bonds to remove questions raised as to their constitutional validity and proceedings for issuing them. See North Shore Bank v. Town of Surfside, Fla., 72 So.2d 659.
*12 Appellants also contend that it was error for the chancellor to pronounce in his validation decree that the proposed bonds were for a public purpose when congress and the legislature had passed resolutions to like effect and evidence taken at the validation proceedings indicated that private enterprise would be primarily benefitted. We do not think there is any merit to this contention. Chapter 26614 recognizes that the continued prosperity and development of the United States and the State of Florida in particular, require improved relationships and increased trade with Latin-American Republics and other countries. Hence, creation of an Inter-American Cultural and Trade Center in Florida was unanimously endorsed by Congress and the President, Joint Res. Sept. 27, 1950, Public Law 853, 64 Stat. 1075. To make the assertions charged in the validation decree was purely discretionary and did not add to or subtract from its force or validity.
It is next contended that the construction of an Inter-American Cultural and Trade Center is not a public purpose and therefore violates Section 10, Article IX of the Constitution, F.S.A.
The functional and the overall purpose of the Trade Center we have alluded to in the forepart of this opinion by quoting from the Ebasco report. In numerous decisions of this court we have approved the imposition of taxes as being in aid of a public purpose. State v. City of Miami, Fla., 76 So.2d 294, dealing with an international trade mart; State v. Town of North Miami, Fla., 59 So.2d 779, 783, having to do with an advertising tax; C.V. Floyd Fruit Co. v. Florida Citrus Commission, 128 Fla. 565, 175 So. 248, 112 A.L.R. 562, approving a tax on citrus fruits for advertising purposes; State v. City of Daytona Beach, 160 Fla. 13, 33 So.2d 218, in which we upheld a tax for the construction of an auditorium, stadium, boat basin and a Negro recreational center designed to enhance the attractiveness of the city as a resort center; State v. Escambia County, Fla., 52 So.2d 125, in which we approved a tax for better recreational facilities for the local and the general public; Starlight Corp. v. City of Miami Beach, Fla., 57 So.2d 6, relating to the use of the municipal auditorium. In all of these cases we approved bond issues or taxes to encourage recreational, business or other facilities for a public purpose. Since the erection of a Trade Center is designed to strengthen cultural relations among the countries of the Western Hemisphere, it can not be said that it amounts to a pledge or loan of the credit of the state to an individual, company, corporation or association in violation of Section 10, Article IX of the Constitution. See also Kentucky Live Stock Breeders' Ass'n v. Hager, 120 Ky. 125, 85 S.W. 738; Briggs v. City of Raleigh, 195 N.C. 223, 141 S.E. 597; Sec. 554.16, Florida Statutes, F.S.A., relating to a public purpose and Sec. 4, Chapter 29830, Acts of 1955, declaring that "the creation of the authority and the carrying out of its purposes is in all respects for the benefit of the people of this state and is a public purpose". Saunders v. City of Jacksonville, 157 Fla. 240, 25 So.2d 648; State v. Monroe County, 148 Fla. 111, 3 So.2d 754, and State ex rel. Harper v. McDavid, 145 Fla. 605, 200 So. 100, 133 A.L.R. 360, uphold such findings.
The doctrine of the foregoing cases is perhaps the best answer to this question. In other words, is the construction of an Inter-American Cultural and Trade Center violative of Section 10, Article IX of the Constitution which inhibits loaning or pledging the credit of the state to any individual, company, corporation or association or to become a stockholder in one? A thorough reading of the text and preamble to Chapter 26614 is also a good answer and the following from the Ebasco report (pp. 5, 6) should remove any doubt as to correctness of the answer:
"The over-all plan of the Center will be that of an unexcelled subtropical garden which will permit advantage to be taken of the area's natural beauty and Florida's exotic flora. Spectacular results will be possible with modern techniques of garden landscaping and structural lighting. Low average *13 building elevations will result in an integrated blending of gardens, buildings, walkways and roads. Layout, planning, landscaping and lighting effects will reduce the awareness of the visitor that he is passing from building to building as he moves throughout the exhibitions.
* * * * * *
"The theme point of the Center will contain a lagoon area with a multipurpose amphitheatre, and will be surrounded by circular levels of exhibition buildings. A canal system will wind throughout the grounds and a canal moat will protect the Center on all land fronting sides. Projected also are an amusement section, picnic and bathing grounds, horticultural and agricultural displays, gardens for religious activities and meditation, birds and animals in natural habitat, children's playground, etc.
* * * * * *
"The project is expected to have particular appeal to the large number of tourists and vacationers who each year are attracted to the State of Florida's natural beauty, climate and unsurpassed recreational facilities. It is estimated that attendance at the Center for each of the first three years of operation will range from 12,000,000 persons to 15,000,000 persons. Thereafter it is expected that average annual attendance for the life of the project will average about 10,000,000 persons. These estimates take into account Florida's tremendous population and tourist growth, population characteristics, incidence of attendance at various other Florida attractions and the appeal of the Center itself.
* * * * * *
"(P. 24): The tourist trade is Florida's principal source of income. Its importance to the State may be measured by the fact that it almost equals the combined income from agriculture and manufacturing. The State Chamber of Commerce has estimated that 5,100,000 tourists came into Florida in 1953 marking an increase from 1,730,000 persons in 1930 or a gain of 200%. At the present rate of growth, the tourist population of the State will increase to 5,500,000 persons by 1958, the proposed opening year for the Center."
As to the third point raised, appellants contend (a) the provisions of the trust indenture requiring the approval of the consulting engineers for action by or on behalf of the Center Authority constitute an unlawful delegation of power; (b) the provisions of the trust indenture with respect to a management division and managing director constitute an unlawful delegation of power by the Center Authority.
Section 554.07(5), Florida Statutes, F.S.A., provides that the Center Authority may "employ consulting engineers, architects, superintendents or managers, accountants, inspectors and attorneys, and such other employees as may be deemed necessary, and to prescribe their powers and duties and to fix their compensation". Section 554.10, Florida Statutes, F.S.A., provides that the resolution authorizing the issuance of the bonds, the trust indenture may contain such provisions for protecting and enforcing the rights and remedies of the bondholders as may be reasonable, proper and not in violation of law, including covenants setting forth the duties of the authority in relation to the construction, acquisition, improvement, maintenance, operation, repair and insurance of the Trade Center properties acquired and may also provide that such Trade Center, or any part thereof, shall be constructed and paid for under the supervision and approval of consulting engineers employed or designated by the Authority and satisfaction to the original purchasers of the bonds.
The duties imposed on the consulting engineer by the trust indenture have been examined and are concerned primarily with estimates that require technical skill and knowledge necessary to construct, finance and operate a project of the proportions of the Trade Center. We are familiar with *14 the rule that in the absence of statutory authority, a public officer can not delegate his powers, even with the approval of the court. We do not think the duties imposed on the engineer in this case went further than was necessary to protect the bondholders and the Center Authority to carry out the objectives of the act and to assure a correct, economical and successful operation of the enterprise on a self-liquidating basis. Section 708 of the trust indenture recognizes and makes extra provision for the protection of the bondholders in the employment of key personnel. This is necessary because the Authority is a continuing one and requires extraordinary skill in managing and accounting. Section 554.10, Florida Statutes, F.S.A., recognizes that the Authority will require managerial and promotional ability of the highest order and makes the usual but exacting provision to secure it. This is not alone necessary to protect the bondholders, it is essential to protect the Center Authority. State v. City of Key West, 153 Fla. 226, 14 So.2d 707. The executive management of a project the proportions of this must have a very competent staff and we do not find that the Authority given the staff in this case exceeds that required of good business management.
The next question for determination is whether or not the bonds of the Center Authority constitute a debt of the State of Florida in violation of Section 6, Article IX of the State Constitution.
The trust indenture as well as the face of each bond provides that "the Authority is not obligated to pay this bond or the interest thereon except from revenues of the Authority, and neither the faith and credit nor the taxing power of the State of Florida or of any municipality or county in the state is pledged to the payment of the principal of or the interest on this bond. No holder of this bond shall ever have the right to compel any exercise of the taxing power on the part of the Authority or of any municipality or county or of any other agency possessing the taxing power to pay this bond or the interest thereon or to enforce the payment thereof against property of the Authority or of any municipality or county in the state."
Section 101 of the trust indenture provides that the bonds of the Authority are payable from (1) admission fees and revenue producing services; (2) cigarette taxes collected on cigarettes sold at retail on the property of the Center Authority; (3) certain excise taxes collected by the Center Authority; (4) beverage and other license taxes authorized to be collected by the Center Authority; (5) operating or leasing property of the Center Authority. In State v. City of Miami, Fla., 63 So.2d 333, we held that the purpose of Section 6, Article IX of the Constitution was to prohibit counties, districts or municipalities from issuing any bonds, except refunding bonds, unless such bonds were approved by a vote of the freeholders. Bonds or certificates of indebtedness payable solely from revenues derived from facilities provided by the proceeds of the bonds were excepted. State v. City of Winter Park, 160 Fla. 330, 34 So.2d 740; Schmeller v. City of Fort Lauderdale, Fla., 38 So.2d 36. Appellant relies on these cases to defeat the bonds.
Appellee contends on the other hand, that State v. City of Tampa, Fla., 72 So.2d 371; State v. City of Miami, Fla., 72 So.2d 655, 656, and State v. City of Coral Gables, Fla., 72 So.2d 48, 49, approve the rule that the cigarette tax imposed by Chapter 210, F.S.A., is an excise tax and may be used or appropriated by municipalities as the legislature directs without an approving vote of the freeholders as required by Section 6, Article IX of the Constitution. See also cases cited in State v. City of Coral Gables, last cited. The acts detailed in the second paragraph of this opinion follow the line defined in State v. City of Coral Gables and cases therein cited in applying the tax collected on cigarettes to payment of principal and interest on the bonds. Other excises mentioned in the preceding paragraph are not directly challenged and are not treated in this opinion.
The next question is whether or not the provisions of the trust indenture, *15 including those of Chapter 30990, Special Acts of 1955, authorizing the Center Authority to lease, exchange or trade any part of The Graves Tract for payment or satisfaction of any bonds or other obligations of the Authority, under which provision the Authority may lease said property as residential, commercial or industrial uses for a period of years, are not in violation of Section 10, Article IX of the Constitution.
Appellants contend that the power granted the Authority under Chapter 30990 and Sections 412 and 403 of the trust indenture do not serve a public or municipal purpose and consequently violate Section 10, Article IX of the Constitution. State v. Town of North Miami, Fla., 59 So.2d 779, is relied on to support this contention. The Inter-American Cultural and Trade Center will provide means to display the industrial, commercial, agricultural and other products of the state. The place or means so provided will be owned, operated and administered by the Center Authority, all of which is authorized by the statute for a public purpose. Any leases or rentals to concessionaries or other lessees to accomplish the purpose of the Center Authority could in no sense be said to be a loan on the credit of the state to any individual, company, corporation or association, State v. Dade County, Fla., 62 So.2d 404.
The Graves Tract consists of approximately 1,652 acres. In addition the Authority contemplates acquiring 185 acres from private owners adjoining The Graves Tract. These lands revert to the city in event construction of the Trade Center be abandoned and that all bonds of the Authority, including refunding bonds, be fully paid and discharged. Section 554.07, Florida Statutes, F.S.A., expressly authorizes the Authority to "lease and dispose of real and personal property for its authorized purposes." Chapter 30990, and other applicable acts vest power in the Authority to do all things necessary to accomplish the purpose of the Authority on businesslike basis. In many instances it proceeds on the advice of the engineer; to discuss all of these provisions would require a very lengthy opinion. We have examined them in detail but find nothing that could be said to violate Section 10, Article IX of the Constitution, the purpose and scope of which was discussed in Bailey v. City of Tampa, 92 Fla. 1030, 111 So. 119. See also State v. City of Miami, Fla., 76 So.2d 294, 297, where we considered bonds of the City of Miami for an International Trade Mart, and North Carolina State Ports Authority v. First-Citizens Bank & Trust Co., 242 N.C. 416, 88 S.E.2d 109.
The next question is whether or not Chapter 29830, Acts of 1955, exempting bonds, charges for admissions and other excises levied by the authority, pursuant to law, including property acquired by it and revenues received therefrom, violates Section 1, Article IX of the Constitution.
Section 1, Article IX of the Constitution, has to do with exemptions from taxation. The substance of it is that the legislature shall prescribe regulations to secure just valuations of property for taxation except property exempt by law for municipal, educational, literary, scientific and other purposes. In order to implement this provision, Sec. 192.06, Florida Statutes, F.S.A., provides:
"The following property shall be exempt from taxation:
"(1) All property, real and personal, of the United States and of this state, except such property of the United States as shall be subject to taxation by this state or any political subdivision or municipality thereof under any law of the United States.
"(2) All public property of the several counties, cities, villages, towns and school districts in this state, used or intended for public purposes, including both real and personal property of all fire, hose and hook and ladder companies, except lands sold for taxes for the use of any counties, cities, villages, towns or school districts."
Section 554.01, Florida Statutes, F.S.A., speaking of the Inter-American Cultural *16 and Trade Center, says "There is hereby created and constituted, as an agency of the State of Florida the inter-American center authority * * *." The members of the Authority are the Governor who is ex officio chairman, and ten others appointed by the Governor. Section 554.16, Florida Statutes, F.S.A., exempts the Authority and its property from tax assessments and declares, "that the creation of the authority and the carrying out of its purposes is in all respects for the benefit of the people of this state and is a public purpose and that the authority will be performing an essential governmental function in the exercise of the power conferred upon it by this Act." A like determination was made by Chapter 29830, Florida Laws 1955, which provides that the bonds of the Authority shall at all times be free from taxation within the state and exempts the Authority from all admissions and other excise taxes.
In Bancroft Inv. Corp. v. City of Jacksonville, 157 Fla. 546, 27 So.2d 162, 170, this court pointed out that exemptions from taxation enumerated in Sec. 192.06, Florida Statutes, F.S.A., are on the theory that the property so exempted, including Federal and State property, is held and used for municipal, educational, scientific, literary, religious or charitable purposes. This doctrine was affirmed in State v. Escambia County, supra; Saunders v. City of Jacksonville, supra. In Briggs v. City of Raleigh, supra [195 N.C. 223, 141 S.E. 599], speaking with reference to the purpose of a state fair as an educational agency, the court said, "promote the general welfare of the people, advance their education in matters pertaining to agriculture and industry, increase their appreciation for the arts and the sciences, and bring them in closer touch with many things which otherwise might remain in reserve".
The criterion for exemption from taxation is the character of the use to which the property is put and not the character of the ownership. State ex rel. Cragor Co. v. Doss, 150 Fla. 486, 8 So.2d 15; City of Lakeland v. Amos, 106 Fla. 873, 143 So. 744. Such exemptions being in the nature of special privileges should be strictly construed against the claimant and in favor of the taxing power. Lummus v. Florida-Adirondack School, 123 Fla. 810, 168 So. 232; Lummus v. Miami Military Academy, Inc., 123 Fla. 832, 168 So. 241; Steuart v. State ex rel. Dolcimascolo, 119 Fla. 117, 161 So. 378.
The exemption in this case was in behalf of the Inter-American Cultural and Trade Center. The legislature found that its properties came within the terms of the Constitution and provided for their exemption. The legislature's finding was based on the policy of the state to "foster and develop international and domestic trade for the benefit of the state and nation, particularly trade in the natural, processed and manufactured products of the state and country, accompanied by an exchange of skills, the promotion of cultural understanding, and the creation of friendship and solidarity between the nations and peoples of the Western Hemisphere." The scheme proposed was approved by the Congress and the President of the United States and what it will accomplish in an educational, cultural or scientific line is for the future to reveal.
The most valuable part of my medical training, said a young intern, was selling vacuum cleaners in the summer between terms. His reasons, though logical and convincing, I do not detail but use the illustration to point the necessity for expanding the orthodox concept of what the makers of the Constitution had in mind when they authorized the legislature to exempt from taxation property used for "education," "scientific" and other purposes. Certainly "educational" and "scientific" use can not now be limited to what one's certificate of graduation from high school and college or university connotes. In the establishment of an Inter-American Cultural and Trade Center for the purpose of intermingling the cultures, the friendships, the trades, crafts, processed and manufactured products, the "know how" and other skills of the people of the Western Hemisphere, the legislature precipitated an unusual experiment. It was conceived as having *17 great educational and scientific potentialities and as an encouragement of the legislature proposes to exempt its properties from taxation. It is not for this court to say that its constitutional prerogative was exceeded or that its discretion was abused in so doing.
It is last contended that Chapter 29830, Acts of 1955, authorizing the Authority to fix and collect charges for admission to the Trade Center and for the privilege of entering or staying in any exhibition, place of amusement or other facility such power not to be affected by the improvement of roads within the Trade Center does not violate Sections 1 and 12, Declaration of Rights, Constitution of Florida.
Appellants contend that not one penny of the admission fees paid to the Authority inures to the state. The facts are that such admissions will be paid to the Authority under the trust indenture to retire the bonds so long as they, or any of them, are outstanding, but when they are retired, all such charges inure to the state. Masters v. Duval County, 114 Fla. 205, 154 So. 172, and Bogart v. Westchester County, 185 Misc. 561, 57 N.Y.S.2d 506, appear to conclude this question.
We have examined Sections 1 and 12, Declaration of Rights, and there is no showing that the guaranties in either will be invaded by Chapter 29830, Acts of 1955. This court does not consider suggestions invoking constitutional guaranties on mere abstract questions. Such adjudication must derive from one affected by the point raised. Here we have nothing but a bald asserted invasion directed to no one in particular which is far from sufficient to evoke an adjudication by any court.
After all, the question here goes to the power of the legislature to create an Inter-American Center Authority and authorize it to establish and operate an Inter-American Cultural and Trade Center. From the land authorized to be acquired, approximately 1,900 acres, the bonds proposed, $70,000,000, and the layout recommended by the Ebasco report, the Trade Center proposed is of immense proportions, rivaling the Chicago and New York World's Fairs of the 1930's. We find no inhibition in the Constitution against provision for such a project, neither do we find any invalidity to the taxes proposed in so far as they are challenged here. We express no opinion as to questions that may lurk in the challenged acts that are not presented. As to the policy and means of fostering such an experiment, the courts have nothing to do. We are concerned only with whether the bonds and proceedings leading to their issue comply with the law. State v. Florida State Turnpike Authority, Fla., 80 So.2d 337.
The decree appealed from is, therefore,
Affirmed.
DREW, C.J., THOMAS, ROBERTS, THORNAL and O'CONNELL, JJ., and CRAWFORD, Associate Justice, concur.