143 So.2d 1 (1962)
STATE of Florida and the Taxpayers, Property Owners and Citizens Thereof, Including Non-Residents Owning Property or Subject to Taxation Therein, Appellants,
v.
INTER-AMERICAN CENTER AUTHORITY, a Public Corporation and an Agency of the State of Florida, Appellee.
No. 31582.
Supreme Court of Florida.
June 20, 1962.
*2 Richard E. Gerstein and Glenn C. Mincer, Miami, for appellants.
Darrey A. Davis and William W. Gibbs, Miami, for appellee.
TERRELL, Justice.
The appellee was the petitioner in the circuit court and will hereinafter be referred to as "the authority." The appellants were the respondents below and will hereinafter be referred to as "the taxpayers." The authority was created by Chapter 554, Florida Statutes, F.S.A. Chapter 29827, Acts of 1955, provided for payment to the authority of cigarette taxes collected on cigarettes sold at retail on property of the authority, less 2 1/2 percent for administration. Chapter 29829, Acts of 1955, amended § 561.20, Florida Statutes, F.S.A., to permit the issuance of not to exceed three liquor licenses within the authority and Chapter 30990, Acts of 1955, authorized the City of Miami to grant and convey to the authority property in Dade County known as the "Graves Tract" at the same time it was authorized to lease or trade any part of such property for any lawful purpose of the authority.
In 1954 the authority employed Ebasco Services Incorporated, a well known firm of consultants, to prepare a report on the feasibility of constructing an Inter-American Cultural and Trade Center in Dade County. In October, 1954, Ebasco filed a report indicating that the financing, construction and operation of the proposed center on a site at the upper end of Biscayne Bay, including the Graves Tract, was feasible and that such a project would be self-liquidating. May 13, 1960, the City of Miami, by special warranty deed conveyed the Graves Tract to the authority at which time the city and authority entered into an agreement dated August 21, 1961, whereby the Graves Tract may be encumbered by the authority for the purpose of acquiring funds to finance the costs of the Inter-American Cultural and Trade Center on conditions not necessary to recite.
March 9, 1962, the authority adopted a resolution authorizing the issuance of revenue *3 bonds in the sum of $21,000,000, to pay the cost of the center, saids bonds to be designated "Inter-American Cultural and Trade Center Revenue Bonds," dated June 1, 1962, to mature subject to the provisions for prior redemption on June 1, 1982. Said bonds were secured by a trust indenture, copy of which is attached to the petition for validation as "Exhibit A."
Order to show cause was duly entered, served and published. Answer was filed by the state attorney on behalf of the state. No other parties appeared as respondents or objectors. April 20, 1962, the cause came on for hearing, testimony was taken and the chancellor entered final decree validating the proposed bonds and the proceedings taken in connection with their issuance. This appeal is from the decree of validation.
It is pertinent to point out at this time that in 1955, the present authority provided for the issuance of $70,000,000 in bonds for the financing of a proposed Inter-American Cultural and Trade Center. The decree of this court approving the decree of the circuit court validating said bonds was dated December 13, 1955. See State v. Inter-American Center Authority, Fla. 1955, 84 So.2d 9.
The taxpayers contend that the last cited case is "not entirely applicable" here. The difference is that as originally conceived the authority proposed to construct and finance buildings to be leased to exhibitors, concessionaires and others as distinguished from the present concept of the center where the authority proposes only to improve and lease land upon which exhibitors, concessionaires and others are to construct their own buildings. The present plan of financing by the authority provides for securing the proposed bonds with a mortgage lien upon the properties of the authority constituting the center created by the trust indenture.
The parties to this cause are in agreement as to essential question for exploiting it. The taxpayers proffer the questions in a rather negative fashion but the authority states them positively. In treating the questions we have elected the positive approach. The most of them are concluded by what we said in State v. Inter-American Center Authority, supra, 84 So.2d 9.
Point One: The authority's enabling act, its bond resolution and indenture are not violative of Section 10 of Article IX of the Constitution of Florida, F.S.A., and the construction of the Inter-American Center will not primarily benefit private persons or corporations.
The point in this question is whether or not the authority's plan serves a public or private purpose; the taxpayers contend that it serves a private purpose and they rely on State v. Town of North Miami, Fla. 1952, 59 So.2d 779, and like cases to support their contention.
We think the question is concluded by our opinion in State v. Inter-American Center Authority, supra.
This court has repeatedly held that when improvements are made with public funds but primarily benefit private parties it will not approve them, but when, as in this case, the purpose is clearly a public one, financing with public funds will be approved. State ex rel. Ervin v. Cotney, Fla. 1958, 104 So.2d 346; State v. Clay County Development Authority, Fla. 1962, 140 So.2d 576.
Point Two: The conveyance of the Graves Tract by the City of Miami to the authority was legal and valid and the authority may lawfully sell, lease or encumber the Graves Tract as provided in the trust indenture.
The second point attacks the validity of the Graves Tract sale by the City of Miami to the authority. Chapter 30990, Special Acts of 1955, expressly authorizes this sale on terms to be agreed on. See also Chapter 31415, Acts of 1956, now § 554.072, Florida *4 Statutes, F.S.A. The proceedings as conducted by the authority and the city in relation to the sale appear to have been executed as directed. There was ample authority to make the sale and it appears to have been legal and validly executed.
Point Three: The bonds proposed to be issued by the authority do not constitute a debt of the State of Florida in violation of Section 6 of Article IX of the Constitution.
This question has to do with the legality of the transaction by which the security for the bonds was acquired, § 554.07, Florida Statutes, F.S.A., and the power given the authority by § 554.072, Florida Statutes, F.S.A., and other statutes. The Graves Tract was acquired pursuant to these statutes. The authority not only had the power to acquire but it had the power to mortgage, encumber, sell, lease, exchange and otherwise dispose of said property. Attention is called to the fact that the trust indenture does not provide for foreclosure. It is true that in cases like Florida National Bank v. Jefferson Standard Life Insurance Co., 123 Fla. 525, 167 So. 378, 108 A.L.R. 77, reasonable limitations on the right of foreclosure are sometimes included but in this case foreclosure is not provided for and is not contemplated. See our opinion State v. Inter-American Center Authority, supra, where power to dispose of any part of the land to satisfy the bonded indebtedness was approved.
We call attention to the fact that the bond form set out in the indenture and to be used by the authority expressly provides:
"The Authority is not obligated to pay this bond or the interest hereon except from the special funds of the Authority provided therefor under the Indenture, and neither the faith and credit nor the taxing power of the State of Florida or of any municipality or county in the State is pledged to the payment of the principal of or the interest on this bond. No holder of this bond shall ever have the right to compel any exercise of the taxing power on the part of the Authority or of any municipality or county or of any other agency possessing the taxing power to pay this bond or the interest hereon, nor to enforce payment thereof against property of any municipality or county in the State."
It is, therefore, submitted that any pledge or "mortgage" created by the trust indenture lacks the elements required to incur the constitutional prohibition and is, therefore, being expressly authorized by the legislative acts cited, legal and valid in all respects.
Point Four: The provisions of the indenture setting aside from the bond proceeds amounts necessary to meet interest requirement for fifty-four months after their delivery are valid and legal.
Section 554.07(10), Florida Statutes, F.S.A., provides:
"To borrow money for any of its authorized purposes and for expenses incidental thereto including expenses incurred during the period of organization and construction prior to the operation of the center, * * *."
Fifty-four months was the period estimated to require preparation of the Graves Tract upon which the center will be constructed. In other words, this is the time required to put the Interama in shape to receive the exhibits and get into operation. The authority contends that capitalizing interest during the period of construction is to provide funds with which to pay interest due on the bonds during the period when Interama will not be producing revenues with which to make such payments. It appears that the period of construction was that estimated by those familiar with different phases of the undertaking. It can hardly be questioned that the period of fifty-four months of capitalized interest was *5 authorized by Chapter 554, Florida Statutes, F.S.A.
Point Five: The provisions of the indenture relating to the functions and duties of the engineers and consultant are a lawful and proper delegation of power of the authority.
When created the legislature authorized the authority to employ skilled personnel as follows:
"To employ consulting engineers, architects, superintendents or managers, accountants, inspectors and attorneys, and such other employees as may be deemed necessary, and to prescribe their powers and duties and to fix their compensation."
When the foregoing provision of § 554.07 (5), Florida Statutes, F.S.A., is read with § 554.10, Florida Statutes, F.S.A., there can be no doubt about the power of the authority to employ engineers and management consultants. When the nature and scope of the center is considered, such services are essential to implement the covenants of the trust indenture, to execute the purposes of the act and to protect the bondholders as well as the authority.
Section 554.10, Florida Statutes, F.S.A., also provides:
"* * * The resolution providing for the issuance of such bonds, the mortgage itself, or the Trust Indenture may contain such provisions for protecting holders as may be reasonable, proper and not in violation of law, including covenants setting forth the duties of the Authority in relation to the construction, acquisition, improvement, maintenance, operation, repair and insurance of the Trade Center properties acquired, or to be acquired * * * and may also provide that such Center or any part thereof shall be construed and paid for under the supervision and approval of consulting engineers employed or designated by the Authority and satisfactory to the original purchasers of the bonds issued therefor, * * *."
This provision, when read with § 554.07 (5), Florida Statutes, F.S.A., has to do with the employment of such personnel and the delegation of power to them, as the authority may deem proper. The same question was raised in State v. Inter-American Center Authority, supra, and under like conditions as here. What we said in the latter case will conclude the point here. The chancellor clearly covered the point on authority of what we said in the last cited case. His judgment on this question is accordingly affirmed.
Point Six: The provisions of the indenture empowering the trustee on behalf of the authority to sell such portions of the properties as necessary to protect the bondholders are valid and constitute a lawful and proper delegation of power and are not violative of any laws prescribing the method of foreclosure of mortgages.
It was pointed out in Point Three that under certain conditions the trustee could sell such portion of the encumbered land at public sale as may be essential to meet current interest and amortization fund requirements. The propriety of this has been fully covered herein. The remaining phase of the question has to do with delegating the power of sale by the authority to the trustee.
Section 554.07(4), Florida Statutes, F.S.A., authorizes the authority to "make contracts with respect to the use or disposal of same or any part thereof, [of its lands] in any manner deemed by the authority to be in the best interest of the center." See also paragraph (2), § 554.072, Florida Statutes, F.S.A., referring to the Graves Tract, being the land in question, which is as follows:
"* * * to grant, convey, sell, lease, trade, exchange, mortgage, encumber in any manner or otherwise dispose *6 of any such property on such terms and conditions and for such prices or consideration as it shall deem proper and for the best interests of the authority."
Under the foregoing provisions the authority has made a contract with the trustee, that is the trust indenture, in re disposal of the lands or any part of them. An examination of Sections 903 and 905 of the trust indenture, also discussed in Point Three, clearly shows adequate limitations, restrictions and conditions are imposed on the power of the trustee in disposing of property pursuant to it. See also what we said under Point Five. In regard to the contention that Point Six assumes that the trust indenture creates a mortgage, in view of what has already been said on this point, it is enough to say that there is no merit to this contention. The persons secured by the trust indenture have no right to the remedy by foreclosure.
Point Seven: The provisions of Chapter 29827, Laws of Florida 1955, providing for payment to the authority of taxes collected on cigarettes sold at retail on property of the authority are not violative of Section 20 of Article III of the Constitution of Florida.
Chapter 29827, Acts of 1955, amended § 210.20, Florida Statutes, F.S.A., and was discussed by this court in State ex rel. Gray v. Stoutamire, 131 Fla. 698, 179 So. 730. The doctrine of this case is conclusive and contrary to the contention of the taxpayers. See also State v. Inter-American Center Authority, supra.
Point Eight: Neither the faith and credit nor the taxing power of the State of Florida or any municipality or county in the state is pledged to the payment of the bonds, and no bondholder shall ever have the right to compel the exercise of the taxing power on the part of the authority, any municipality or county or any other agency possessing such power to pay said bonds or enforce payment against the property of any municipality or county in the state.
The taxpayers contend that a pledge like that involved in this question constitutes a pledge of the taxing power of the state in violation of Section 6, Article IX, of the Constitution of Florida.
The following cases conclude this point contrary to the contention of the taxpayers: State v. Inter-American Center Authority, supra; Panama City v. State, Fla. 1957, 93 So.2d 608; State v. City of Auburndale, Fla. 1956, 85 So.2d 611, and Welker v. State, Fla. 1957, 93 So.2d 591. See also what we said on Point Three in this opinion, which is also conclusive.
Point Nine: The decree of the lower court validating the $21,000,000 Inter-American Cultural and Trade Center Revenue Bonds is valid in all respects.
This question appears to be superfluous. It seems to us that State v. Inter-American Center Authority, supra, concludes most of the points in this case. Chapter 554, Florida Statutes, F.S.A., as amended, authorizes the authority to issue the bonds in question.
It results that the decree of validation appealed from must be, and is hereby, affirmed.
Affirmed.
THORNAL and HOBSON (Ret.), JJ., concur.
ROBERTS, C.J., and THOMAS, J., concur specially.
ROBERTS, Chief Justice (concurring specially).
As the author of the opinion of this court in State ex rel. Ervin v. Cotney, Fla. 1958, 104 So.2d 346, and as one of the majority in State v. Clay County Development Authority, Fla. 1962, 140 So.2d 576, I feel impelled to comment in concurring in the opinion of Mr. Justice TERRELL that I see no conflict in the opinion in the Clay *7 County case, supra, and in the opinion in this case. In the Clay County case this court, in passing on the question of whether the purpose for which the bonds there were to issue was a private as distinguished from a public purpose, quoted with approval the following language from the Cotney case:
"* * * When construed as authorizing the sale or lease for industrial and commercial purposes of a portion, only, of a tract of land acquired as a single project encompassing recognized public purposes as the primary object of the acquisition; or as authorizing the construction of improvements on such property for utilization by private enterprises as an incident to and in furtherance of a primary and recognized public purpose, cf. Gate City Garage, Inc., v. City of Jacksonville, supra, 66 So.2d 653; Panama City v. State, supra, 93 So.2d 608, we find no constitutional infirmities in the Act." 140 So.2d p. 579
The legal principles involved in this case and in the Clay County case are similar. The factual situation, however, in the two cases is so vastly different as to require a different result. Admittedly in cases of this kind there are no black and white areas nor can there be said to be any distinct line of demarcation. The facts in each case determine the question of whether the securities to be issued are for the purpose of constructing a project in violation of Section 10 of Article IX of the Florida Constitution. In the Clay County case the record established to the satisfaction of a majority of this court that the primary purpose to be served by the issuance of the obligations therein, by an admittedly public authority, was to lend the credit of such authority to a private enterprise for private gain contrary to the constitutional provisions above. If the facts in this case were that the authority here proposed to issue these obligations for the purpose of constructing and equipping a large private enterprise on all or a portion of the tract of land involved under the agreement and to lease the same for nearly a quarter of a century to such enterprise, thereby relinquishing the complete control thereof for such period as was the case in the Clay County proceedings, then undoubtedly we would be required to hold, as we did in that case, that the issuance of such bonds was in violation of the constitutional provision above mentioned. But the situation presented by the record here is vastly different. That the overall plan for the development of this enterprise is a public purpose was decided long ago by the unanimous opinion of this court in the first Interama case where we specifically held that the construction of an Inter-American Cultural and Trade Center was a public purpose and did not violate Article IX, Section 10 of the Constitution. State v. Inter-American Center Authority, 84 So.2d 9, text pp. 12, 13 and 14. The public purpose served is stated in detail in the first Interama case and the passage of time following that decision has only emphasized the public necessity of developing cultural and trade relations with the countries which lie to the south.
That some private purposes will be served is inevitable in every undertaking of this kind. When a public park or playground is constructed, it certainly benefits the peanut and popcorn vendors. When a public fishing pier or area is constructed, the seller of bait and fishing tackle profits thereby and even in the construction of such public works as court houses and city halls, the blind who so often operate lunch stands and cigarette counters within the confines are benefited but on one contends that such incidental private purpose defeats the overall public purpose so it resolves itself into a matter of degree which, as we have stated, must be determined from the facts in each case. The proof is overwhelming here that whatever private purpose is to be served will be wholly and completely incidental to the primary public purpose. The project being admittedly a public one and finding as *8 we do that any private purpose served under the factual situation presented by the record here is incidental and inconsequential, it follows that the trial court properly validated the bonds.
For the above as well as the reasons set forth in the opinion of Mr. Justice TERRELL, I concur in the judgment affirming the decree of validation.
HOBSON (Ret.), J., concurs.
THOMAS, Justice (concurring specially).
I agree to the conclusion because of my concurrence in the opinion of the court in State v. Inter-American Center Authority, Fla., 84 So.2d 9.
THORNAL, Justice (concurring).
I concur in the opinion and judgment prepared for the Court by Mr. Justice TERRELL. In doing so I must add that I also ground my conclusion on the argument and authorities set forth in my dissenting opinion and the dissenting opinion of Mr. Justice TERRELL in State of Florida v. Clay County Development Authority, Fla., 140 So.2d 576. With all due deference to the views of the majority in the instant case, I frankly can find no basic distinction between the instant proposal for the expenditure of public funds to build a building and lease the same to private tenants, and the Clay County situation in which the Authority proposed the same identical procedure. Yet, in the instant case the majority approves the action of the Authority, while in the Clay County case the majority condemned as invalid, a proceeding which appears to me to have been almost identical. I, therefore, have the view that the majority opinion here is directly in conflict with the majority in Clay County. However, since the majority opinion here is consistent with my dissent in Clay County, and harmonizes with my views as to what the law is, I concur in both the opinion and the judgment.