146 So.2d 100 (1962)
STATE of Florida, Appellant,
v.
CITY OF TAMPA, a Municipal Corporation, Appellee.
No. 32047.
Supreme Court of Florida.
October 26, 1962.
*101 Paul B. Johnson, John R. Lawson, Jr., and Peter J.T. Taylor, Tampa, for appellant.
Paull E. Dixon, Henry E. Williams, Jr., Tampa, and Mitchell, Pershing, Shetterly & Mitchell, New York City, for appellee.
TERRELL, Justice.
July 23, 1962, the City of Tampa, a municipal corporation, filed its petition in the Circuit Court praying for the validation of $10,000,000 Special Obligation Capital Improvement Bonds (Series E), to be issued as provided by Ordinance No. 2166-A of the City of Tampa which authorizes the issuance of special obligation bonds of the City, payable solely from the proceeds of the utilities service tax for capital improvements. Section 208 of said ordinance authorizes the issuance of $20,000,000 bonds in series from time to time, all of which have issued and designated Series, A, B, C, and D, respectively. Section 209 of said ordinance authorizes the issuance of additional parity bonds subject to the conditions in this section, which is the section under which Series E Bonds are to be issued.
Pursuant to Section 209 the City Council on July 17, 1962, adopted the following resolutions:
Resolution No. 5501-D, authorizing $2,700,000 bonds for acquiring certain land and an interest in certain additional land now owned by the Atlantic Coast Line Railroad Company and described in an agreement, dated June 30, 1960, as amended, between the City and the Railroad Company.
Resolution No. 5502-D, authorizing $305,000 bonds for site improvements on a portion of the land described in the above mentioned agreement.
Resolution No. 5503-D, authorizing $3,075,000 bonds for a convention center on a portion of the land described in the above mentioned agreement.
Resolution No. 5504-D, authorizing $3,920,000 bonds for street improvements.
Resolution No. 5505-D, consolidating the bonds authorized by the foregoing resolutions and providing for their issuance as a single series aggregating $10,000,000 and designated "Special Obligation Capital Improvement Bonds (Series E)."
The following paragraphs from appellee's brief are also important because they more specifically detail the transaction between *102 the City of Tampa and the Atlantic Coast Line Railroad Company:
"The Agreement between the City and the Railroad Company provides for the payment by the City to the Railroad Company of $3,350,000, $3,200,000 of which is allocated as the purchase price of Areas `A', `B', `C-1', `C-2' and `C-3' and $150,000 of which is allocated as full payment in advance of the rental for Area `D' for the entire 35-year lease term. $650,000 of the $3,350,000 has been paid to date by the City, and the $2,700,000 authorized by Resolution No. 5501-D is to pay the balance.
"The City may renew the original 35-year lease of Area `D' for two additional 35-year periods upon payment in each instance of $150,000 in advance for the entire renewal period (Tr. 45); it may purchase Area `D' at any time within 5 years from September 1, 1962 for $2,000,000 (Tr. 48); or it may purchase Area `D' for $10,000 at any time during the last year of the original 35-year lease period or at any time during either of the two additional 35-year periods (Tr. 52).
"The convention center for which bonds were authorized by Resolution No. 5503-D is to be constructed and the site improvements for which bonds were authorized by Resolution No. 5502-D are to be made in part on the land to be conveyed to the City by the Railroad Company and in part on the Area `D' land to be leased to the City by the Railroad Company."
The first question presented proposes this query: Is construction of a convention center by the City of Tampa within the purview of the public purpose for which public monies can be expended, when the convention center would be constructed in part upon land leased from a private corporation?
Appellant admits that Section 1, Chapter 9095, Sp.Acts of 1921, Section 1, Chapter 3, Compilation of the Charter of the City of Tampa, authorizes the City to lease land lying within the City of Tampa for various purposes. Appellant further admits that the City of Tampa has power to issue bonds of the type and for purpose of those involved in this case for the construction of improvements and public buildings. State v. City of Tampa, Fla. 1957, 95 So.2d 409, supports this admission.
In this case, however, says the appellant, the City of Tampa proposes to use a portion of the proceeds of the bonds in question to construct a convention center on property, the title to which is vested in the Atlantic Coast Line Railroad Company, a private railroad corporation.
Unless the City should either renew the lease or exercise one of the options to purchase, contends appellant, the convention center and the site improvements would become the property of the railroad company at the expiration of the lease if not razed or removed during the term of the lease or within a reasonable time thereafter.
To meet this contention of appellant, the appellee points out that the effect of the lease in question is to give to the City of Tampa a non-cancellable right to the unrestricted use and occupancy of Area D for 35 years. Even if the City for any reason, says appellee, should fail to meet its obligations under paragraphs 4 and 5, the railroad company could not in its enforcement of these provisions cause a cancellation or forfeiture of the lease in the absence of any provisions in the lease therefor. The courts of this country, says appellee, will not declare a forfeiture where there is no provision in the instrument for one. Ready v. Safeway Rock Co., 1946, 157 Fla. 27, 24 So.2d 808.
From the record it is quite evident that the City holds the lands in question in fee as to some and under a long term lease with option to purchase as to others. The leasehold interest of the City, in Area D, is represented by a lease which acknowledges receipt of the $150,000 rental payment for the *103 full 35-year term of the lease and provides that the only obligations of the City thereunder will be to pay all taxes and assessments, if any, levied and assessed against the property and to save and keep the railroad harmless from any liability on account of the City's holding and use of the property. Other provisions in the lease save the City in case of forfeiture, loss through eminent domain proceedings or through other means. When these and other provisions are considered in sum we find no merit for the challenge that the convention center is being constructed in part on lands leased from a private corporation.
This court has frequently approved the construction of an auditorium, stadium, warehouse, inter-American cultural and trade center and other such structures as an international trade mart as a proper public purpose. State v. City of Daytona Beach, 1948, 160 Fla. 131, 33 So.2d 218; State v. City of Miami, Fla. 1949, 43 So.2d 457; Starlight Corporation v. City of Miami Beach, Fla. 1954, 57 So.2d 6; State v. City of Miami, Fla. 1954, 72 So.2d 655; State v. Inter-American Center Authority, Fla. 1955, 84 So.2d 9, and State v. City of Miami, Fla. 1954, 76 So.2d 294.
In State ex rel. Ervin v. Cotney, Fla. 1958, 104 So.2d 346, this court approved the doctrine that if a valid public purpose will be effectuated by a proposed plan of acquisition and improvement of property by a public body, the fact that a sale or lease of a portion of the improvements to private parties was contemplated will not invalidate the plan.
As we read the contract, if carried out as contemplated the City will finish with a fee title to that portion of the land on which the convention center is to be constructed and the improvements are to be made. It will also have an irrevocable right to possession and use of the land embraced in Area D for 35 years, which is 5 years beyond the maturity of the bonds and 5 years beyond the amortization period of the cost of these projects to the City. If it should be determined during the last year of the 35-year period that retention of the portion of the convention center building and improvements on the Area D site would be to the advantage of the City, at the expiration of the 35th year, the City has the option of acquiring the fee to Area D by paying the Railroad Company the nominal sum of $10,000 or extending the lease for another 35-year non-cancellable period by paying the Railroad Company $150,000. It seems to us that in every aspect of this contract the City and the people are protected.
To support its contention that the City need not have an absolute and indefeasible title to land on which it plans to construct public improvements, the City relies on Trustees of Watts Hospital v. Board of Commissioners for Durham County, 231 N.C. 604, 58 S.E.2d 696, and Jackson v. City of Madison, 12 Wis.2d 359, 107 N.W.2d 164. In the first of these cases Watts Hospital held what was called a determinable fee. The court approved the deed for the purpose of constructing the hospital.
The second case involved the expenditure of $5,500,000 of bond proceeds in building and equipping an auditorium and civic center on the tract of land locally known as "Monona Terrace," a considerable portion of which was reclaimed land granted to the city by the state on revocable permit. One question raised in this case was the following:
"Will it be a gross abuse of discretion by the Madison city council to spend $5,500,000 of its taxpayers' money to build a civic auditorium and parking ramp on the bed of Lake Monona which is owned by the state and for the use of which the state has granted to the city only a revocable permit?"
The answer of the court to this question is very pertinent and striking when read in connection with the facts in the case at bar.
It is pertinent to point out that in the North Carolina case above cited, the County of Durham was required to continue use of *104 the property for hospital purposes which necessitated a substantial expenditure annually of city funds in order to retain the property. In the Wisconsin case the right of the city to continue the use of the auditorium on state-owned land was subject to the option of the state to revoke its grant. In the case at bar the City of Tampa is required to expend only $10,000 thirty-five years from date of the contract to continue use and occupancy of the convention center site, the option to continue such use being solely in the city.
It is appropriate to point out that these bonds, principal, interest and any other charges against them, are payable solely from the proceeds of the utilities service tax of the City and that the general credit of the City is in no way responsible for their payment. It is true that the contract between the City and the Railroad Company for acquiring the land and materializing the project runs over a longer period than such contracts usually run, but there is nothing complex or unusual about it. The rights of the parties are safeguarded and in the end both parties to the contract got all they bargained for. There is not the slightest suggestion of fraud or overreaching. In fact, to many the triangular piece of land involved had become an "eyesore" and one of the objectives of the contract was to convert that into an attractive utility and a thing of beauty.
The second and only other question presented may be stated as follows: Is the construction of a convention center by the City of Tampa on land leased from a private corporation a loan of the credit of the City of Tampa to a private corporation in violation of Section 10 of Article IX of the Florida Constitution?
From the facts it appears that the construction of the convention center and making the improvements in part on Area D will be a public purpose of the City of Tampa; that the borrowing of funds therefor will likewise be for a public purpose and consequently not a loan of the credit of the City of Tampa to a private corporation in violation of Section 10, Article IX of the Florida Constitution, F.S.A.
For the reasons so stated, it follows that the decree of the chancellor validating the $10,000,000 Special Obligation Capital Improvement Bonds (Series E) of the City of Tampa, dated October 1, 1962, should be, and is hereby affirmed.
Affirmed.
ROBERTS, C.J., and THOMAS, DREW and CALDWELL, JJ., concur.