Van Voorhis, J. (dissenting).
This statute (L. 1962, ch. 209), as drafted, includes a great deal more than the sponsors of a World Trade Center were talking about, and renders it in my opinion subject to the constitutional defects which the Appellate Division has found. These provisions, as analyzed and criticized by the Appellate Division, appear to have been due to no inadvertence ; they bear every indication of having been consciously and deliberately inserted so as to grant to the Port Authority extensive and uncontrolled governmental power to condemn and manage private real property for private purposes as a major object of the act.
The cases upholding the constitutionality of public ownership and maintenance of piers in the Hudson River (Matter of Mayor of City of N. Y., 135 N. Y. 253, 263) or public markets or world’s fairs or airports (Matter of Cooper, 28 Hun 515, app. dsmd. 93 N. Y. 507; Hesse v. Rath, 249 N. Y. 436; Kennedy & Co. v. New York World’s Fair, 288 N. Y. 494) are wide of the mark. This statute puts the Port Authority in the real estate business, by making it a potential landlord, as it says itself at page 6 of its own brief, of “ a community of firms engaged in direct import-export activities and it is hoped that they will establish quarters in the World Trade Center and use the Port of New York for increasing volumes of cargo. These include some share of the 200 combination export managers, 2000 general exporters, 4200 general importers and in addition, 2900 United States manufac *394 turers responsible for seventy-six per cent of current United States exports.” These are in addition, the Port Authority’s brief says, to “ over 100 banking organizations financing world trade. ’ ’
All of these and many more private activities, the Authority contends on this appeal, become public purposes if only they are “ centralized ” in some nebulous manner in the 13 blocks on the west side of lower Manhattan within which the Hudson & Manhattan terminal is located. This selected area was transferred from the east side, where it had been located by chapter 312 of the Laws of 1961, including the New York Stock Exchange, which apparently is no longer deemed to be one of the financial organs of world' trade that needs to be 1 ‘ centralized. ’ ’
Nothing in the statute indicates by what standard of judgment selection is to be made from among this multitude of private organizations engaged in export and import for location in this area. It is suggested that priority should be given to the United States Custom House, “the heart of the entire centralization concept ” (appellant’s brief, p. 19), but, apart from the anomaly of this instrumentality of New York and New Jersey spending State money for the construction of Federal buildings, the Federal Government says that it is constructing its own new building in Foley Square, where the Customs Court and many of its other activities will be located and that no arrangements have been made with the Port Authority for occupancy with the World Trade Center.* Emphasis has been placed upon United States appraisers’ stores, customs brokers, freight forwarders and the like. But we have to read the statute, not merely proclamation of administrative policy, since constitutionality is determined by what can be done under a statute not by what may be attempted (Rosalsky v. State of New York, 254 N. Y. 117, 121). Respondents’ brief points to the quantity of space occupied in New York City for foreign trade, and the impossibility of condensing it into this area of 13 blocks, and questions by what principle private firms are to be selected for location'there (pp. 36-37):
“ For example, the Empire State Building advertises that it is * World Headquarters ’ for foreign firms. It issues a pam *395 phlet giving a ‘ Statement of facts for foreign firms, importers and exporters. ’ In this it says that ‘ More than 100 foreign firms have their offices in the Empire State Building. ’ It lists the names of these firms, which it says have ‘ A world-famous' business address for major firms from the six continents. ’
“ But this is not the only building in New York City claiming to serve this purpose. The huge Pan-American Building, just north of Grand Central Station, makes similar claims. This building, ‘ The Commerce Capital ’, is surpassed in size only by the Pentagon in Washington and the Merchandise Mart in Chicago. It has just (March 7,1963) been dedicated in ceremonies reflecting its ownership and financing by American and British interests, its importance underscored by the presence of the Secretary of Commerce and his British counterpart. These are but two of the many New York buildings seeking to house businesses engaged in foreign trade. And the New York Classified telephone directory indicates many, many classifications of business activity which would most surely he eligible for inclusion in the Port Authority’s vast real estate complex.
‘ ‘ When one becomes ‘ acclimatized ’ to the vast ‘ concept ’ of the World Trade Center, one must answer the question: What will be the effect on our economic structure of the colossal upheaval which it seeks to attain? The project on this site was conceived almost overnight and is now claimed to represent the mature judgment of the Legislatures of New Jersey and New York. Surely it must he examined in the light of what the statute itself says, and not on the basis of a general idea, notion or concept.”
This raises constitutional questions, if the Constitutions any longer protect private property.
When one examines the statute, as the Appellate Division did, and contrasts its provisions with much that has been loosely stated about this “ concept ”, it discloses a fundamental purpose — not one which is ‘ ‘ incidental ”. “ World Trade Center ’ ’ is defined in section 2 of the act as consisting of any quantity of structures or areas within the 13-block tract, “ convenient or desirable in the opinion of the port authority for * * * functions, activities and services for or incidental to * * * the exchange, buying, selling and transportation of commodities or other property in world trade and commerce, the promotion *396 and protection of such trade and commerce, governmental services related to the foregoing, and other governmental services, including but not limited to ” etc.
‘ ‘ Exercising this power ’ ’, the opinion of the Appellate Division accurately states (17 A D 2d, pp. 598-599): “ would indeed make this project, in reality, what the appellants call a real estate development. It is so broad that it is difficult to think of any enterprise, or any business in the City of New York, which could not find a home within the condemned area, although devoted exclusively to private purposes. * * * There are very few, if any, commercial buildings, within the City of New York that do not house enterprises of the nature contemplated.” It is incredible that, under a free enterprise system, the “ centralization ” of these multifarious activities could transform the housing of them from private to public purposes within the application of the law of eminent domain. That a project may be desirable or that it may have some indirect public benefit is not the equivalent of a public purpose (Matter of New York City Housing Auth. v. Muller, 270 N. Y. 333, 343).
The Appellate Division well stated (17 A D 2d, p. 595): “To conclude otherwise could well result in a rule of law that the power of eminent domain may be exercised in almost any situation where some nexus with the public good may be established.”
Of course, if the ‘ ‘ centralizing ’ ’ of these private functions of foreign commerce be deemed to be a public purpose, then the rental obtained from the buildings or offices would be of the essence of the project, and not merely “incidental”, and so could be utilized to offset the deficits of operating the Hudson & Manhattan Railroad. That means that being engaged in foreign trade, in some capacity, transforms a private entrepreneur into one conducting a public purpose if it is selected by the Port Authority as one from among many to be housed in the project area. On this uncertain principle depends the constitutionality of this whole statute. The Appellate Division was correct in stating that under the powers conferred by this statute the Authority could use nine tenths of the 13 blocks for obtaining revenue to offset the revenue deficits of the Hudson & Manhattan provided only that they were rented to private manufacturers, traders, or other entrepreneurs whose activities were *397 being “centralized”, i.e., to whom the Authority decided to rent space in the project area.
The Chairman and the Executive Director of the Port Authority have had occasion publicly to take inventory of the causes of the relative decline of New York Harbor among eastern coastal ports, ascribing its comparative deterioration to other factors than “ concentration ” of export and import activities (S. Sloan Colt, Chairman, New York Herald Tribune, May 25,1962; Austin J. Tobin, Christian Science Monitor, Dec. 24,1962).
Regardless of whether some activities might be concentrated to advantage, mainly of a governmental nature, if the statute had been limited to them, it is inconceivable that all of these private activities or even a major portion of them could be concentrated in an area of 13 blocks. If this statute be constitutional, the Legislature could amplify the 13 blocks to include any larger area in the City of New York. If this could be done in connection with foreign commerce, it could be accomplished constitutionally with domestic commerce in case of this or any other city that might be deemed to be losing its relative economic position.
The courts of other States have had occasion to rule upon the constitutionality of legislation of this character, holding it to be invalid (Matter of Opinion of Justices, 332 Mass. 769 [1955]; Hogue v. Port of Seattle, 54 Wn. [2d] 799 [1959]; Opinion of Justices, 152 Me. 440 [1957]; Opinion to Governor, 76 R. I. 365).
State v. Inter-American Center Auth. (84 So. 2d 9 [Fla., 1955] ; 143 So. 2d 1 [Fla., 1962]) is not to the contrary, inasmuch as the Authority which was there involved was limited to educational and scientific purposes in strengthening cultural relations among the countries of the western hemisphere. If the New York Port Authority had been content with powers like that, this litigation would not have arisen.
Much has been said in argument and in the briefs about the importance of the Port of New York and the desirability of maintaining its competitive position on the eastern seaboard. Chambers of Commerce and other organizations have joined in this refrain. Quite possibly the kind of trade center which they have been thinking about would be an asset, if the statute had been drawn in that way. It may well be that the Port of New *398 York Authority, traditionally jealous of its solvency, was unwilling to take over the Hudson & Manhattan Railroad without the World Trade Center, and thus help meet its deficits by expropriating the good will and condemning the real estate of private property owners instead of by general taxation. It taxes credulity, however, to believe that the Authority would insist upon taking over two insolvent operations simultaneously, if it really considered that the World Trade Center would not meet its own expenses for 10 years as the Authority’s brief says at page 56.
This is not all a matter of policy for the Legislature. It is the function of courts to give effect to the Constitutions, State and Federal. It is the solemn duty of courts to enforce the constitutional limitation against taking private property by eminent domain except for public purposes. It is idle to suggest that respondents and others in like position are protected by condemnation procedures against taking for nonpublic purposes, inasmuch as the effect of the majority decision is to characterize the condemnation of any real estate in this 13-block area as being for a public purpose. What constitutes private property or public purposes changes from time to time, but the basic concept of private property does not change. If powers such as these be upheld to condemn property in good condition which is not potentially shun (cf. Cannata v. City of New York, 11 N Y 2d 210), without even paying for the good will, what may appear1 to be for the advantage of the Hew York City Chamber of Commerce or the Downtown Lower Manhattan Association or the Hew Jersey State Chamber of Commerce, or the Chambers of Commerce of Jersey City or Hewark today may be turned against them tomorrow, as their counterparts learned in other countries to their sorrow and dismay after they had surrendered to the collectivist state. This ever-growing ascendency of government over private property and over free enterprise is no respecter of persons and cannot long be harnessed by those who expect to use it for private ends. As governmental ascendency is increasingly sanctioned by the constitutional law of our State, private capital is less likely to be invested to develop the Port of Hew York and more likely to fold its tents and silently move toward other States where government competition and expropriation are more restricted. As the eases show that have *399 been previously cited, the power of government in these respects has been curbed by the courts of other States.
Disregard of the constitutional protection of private property and stigmatization of the small or not so small entrepreneur as standing in the way of progress has everywhere characterized the advance of collectivism. To hold a purpose to be public merely for the reason that it is invoked by a public body to serve its ideas of the public good, it seems to me, can be done only on the assumption that we have passed the point of no return, that the trade, commerce and manufacture of our principal cities can be conducted by private enterprise only on a diminishing scale and that private capital should progressively be displaced by public capital which should increasingly take over. The economic and geographical advantages of the City of New York have withstood a great deal of attrition and can probably withstand more, but there is a limit beyond which socialization cannot be carried without destruction of the constitutional bases of private ownership and enterprise. It seems to me to be the part of courts to enforce the constitutional rights of property which are involved here.
The World Trade Center, as conceived by chapter 209 of the Laws of 1962, also violates article I (§ 10, subd. 3) of the United States Constitution, as it seems to me, which provides that no State shall enter into any agreement of compact with another State without the consent of the Congress. The 1921 compact between New York and New Jersey, to which congressional consent was obtained (42 U. S. Stat. 174), provides that the Port Authority is authorized to purchase, construct, lease and operate “any terminal or transportation facility” and “ for any of such purposes to own, hold, lease and/or operate real or personal property” (L. 1921, ch. 154, § 1, art, VI; italics supplied). The language of chapter 209 of the Laws of 1962 as well as the Port of New York Authority’s prospectus demonstrate that this is neither a terminal nor transportation facility (cf. Bush Term. Co. v. City of New York, 282 N. Y. 306, 316). Centralization of the far-flung export and import enterprises in 13 blocks in lower Manhattan, even if that were possible and even if it were a public purpose, would not constitute a terminal or transportation facility. The congressional consent in 1921 to “ such other and additional powers as shall be conferred upon *400 [the Port Authority] by the legislature of either state concurred in by the legislature of the other ” can hardly be construed as extending beyond such as are incidental to terminal or transportation facilities. Injecting the Port Authority into a huge project to compete with private enterprise in the real estate field, for the supposed purpose of maintaining the ascendency of New York over eastern coastal seaports in other States, is outside of the original compact between New York and New J ersey.
The orders of the Appellate Division appealed from should be affirmed.
Chief Judge Desmond and Judges Dye, Fuld, Foster and Sotleppi concur with Judge Burke; Judge Van Voorhis dissents in a separate opinion.
In the declaratory judgment action: Order reversed, without costs, and matter remitted to Special Term for entry of a judgment that chapter 209 of the Laws of 1962 is constitutional. Question certified answered in the negative.
In the condemnation proceeding: Order of Appellate Division reversed and that of Special Term reinstated, without costs.

 See letter from the United States General Services Administration submitted by respondents (brief, pp. 75-76).